UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RECEIVED
SDNY PRO SE OFFICE

2022 SEP 29  PM 2: 59

Ralph Rodriguez, Din # 17A0928                    22-CV-02198 (PMH)
                    Plaintiff Pro-Se

---

- A G A I N S T -


Edward Burnett,et.,al.,
                    Defendants


---


MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS REQUEST TO RE-SUBMIT IN OPPOSITION TO

DEFENDANTS MOTION TO DISMISS,


                              Ralph Rodriguez, Din # 17A0928

                              Plaintiff being Pro-Se

                              Fishkill Correctional Facility

                              P.O Box 307, Beacon

                              New York 12508

TABLE OF CONTENTS
_____

Table Of Authority, Page..... 3, 4

 Preliminary Statement , Page..... 5

 Statement Of Facts, Page..... 6, 7

 Standard Of Review, Page..... 8, 9,

            ARGUMENT
            _____

 Opposition to Defendants Point # 1, Page..... 10

 Opposition to Defendants Point # 2, Page..... 10, 11, 12, 13

 Opposition to Defendants Point # 3, Page..... 14, 15

 Opposition to Defendants Point # 4, Page..... 16, 17, 18

 Opposition to Defendants Point # 5, Page..... 19

 Opposition to Defendants Point # 6, Page..... 20, 21, 22

 Opposition to Defendants Point # 7, Page..... 14, 15

 Opposition To Defendants "Motion To Dismiss, CONCLUSION", Page..... 23

TABLE OF AUTHORITY
——————————

Ashcroft V. Iqbal, 556 U.S. 622, 679 (2009), Page..... 8 , 9

Triestman V. Fed. Bureau Of Prisons, 470 F.3d 471, 474 (2d Cir 2006). Page..... 8

Sealed Plaintiff V. Sealed Defendants, 537, F.3d 185, 191 (2d Cir 2008). Page..... 8

Erickson V. Pardus, 551 U.S 89, 94 (2007). Page..... 8

Daniel V. T & M Prot. Res. Inc, 992 F.Supp 2d, 302, 304 N.1 (S.D.N.Y 2014). Page..... 8

Koch V. Christie's Int'l Plc, 669 F.3d 141, 145 (2d Cir 2012). Page..... 8

Leonard F. V. Isr. Disc. Bank Of N.Y, 199 F3d 99, 107 (2d Cir 1999). Page..... 8

Wang V. Palmisano, 157 F.Supp 3d 306, 317 (S.D.N.Y 2016). Page..... 8

Alsaifullah V. Furco, No. 12-CV-2907, 2013 WL 3972514 at *4, n.3 (S.D.N.Y Aug. 2, 2013). Page..... 9

Agu V. Rhea, No. 09-CV-4731, 2010 WL 5186839, at *4 N.6 (E.D.N.Y. Dec. 15, 2010). Page... 9

Williams V. Smith, 781 F.2d 319, 323-24, (2d Cir 1986). Page..... 9 , 11, 20

Poe V. Leonard, 282 F.3d 123, 140 (2d Cir 2002). Page..... 9

Harell V. New York State Department Of Corrections and Community Supervision, No. 15-CV-7065 (RA), 2019 WL 3821229. Page..... 12

Nicholas Magalios V. Mathew Peralta, No. 19-CV-6188 (CS), 2022 WL 407403. Page..... 12

Thompson V, Booth, No. 16-CV-3477 (KMK), 2018 WL 2160372. Page..... 12 , 22

Lurch V. Bui, No. 9:19-CV-895 (DNH/DJS), 2020 WL 1169364. Page..... 12

Wilson V. Snyder, No. 9:19-CV-420 (DNH/CFH), 2019 WL 8192227. Page..... 12

Abdallah V. Ragner, No. 12-CV-8840 (JPO), 2013 7118083. Page..... 12

O'Connor V. Featherston, No. 01-CV-325 (HB), 2003 WL 554752. Page..... 12

Shaw V. Ortiz, No. 15-CV-8964 (KMK), 2016 WL 7410722. Page..... 12 , 22

Kendall V. Cuomo, No. 12-CV-3438 (ALC)(RLE), 2013 WL 5425780. Page..... 12

Rodriguez V. City Of New York, No. 15-CV-07945 (ALC), 2018 WL 1276826. Page..... 14

Mullenix V. Luna, 577 U.S. 7, 11, 136, S.Ct 305, 193, L.Ed.2d 255 (2015). Page..... 19

Anderson V. Creighton, 483 U.S. 635, 107 S.Ct 3034, 97, L.Ed.2d 523 (1987). Page..... 19

Gonalez V. City Of Schenectady, 728 F.3d 149, 154 (2d Cir 2013). Page..... 19

District Of Columbia V. wesby, U.S 138, S.Ct 577, 589, 199, L.Ed.2d 453 (2018). Page.....19

Anderson V. Liberty Lobby, Inc, 477 U.S. 242, 249 (1986). Page..... 19

SEE ALSO

2005 Prison Monitoring Report: Fishkill Correctional Facility, Correctional Ass'n Of

N.Y. at 1, 3-5 (feb. 15, 2005). Page..... 12

## PRELIMINARY STATEMENT

Plaintiff Ralph Rodriguez, Din # 17A0928, being incarcerated at Fishkill Correctional Facility, and moving Pro-Se, had submitted a Complaint against Defendants that was a "Total Of 68 Pages, including Cause Of Action, and Exhibits amounting to on or about 107 pages", to insure that this Honorable Court had the Proof needed to validate Plaintiff claim, that prior to the commencement of the 1983 and A.D.A title II, and Section 504 of the Rehabilitations act, that plaintiff attempted to resolve all the issues in the complaint without success before bringing the Action against defendants for there intentional violations of Plaintiffs Protected Constitutional Rights.

Defendants at all times was on notice of the issues raised in the complaint and had more than enough chances to resolve the issues, and was in a position of authority to do so but failed to, through there actions and/or inactions and had created a Policy and/or Custom within Fishkill Correctional Facility, that allowed these Constitutional violation to continue.

At all times defendants knew that plaintiff is Fully Disable with Documents and Medical Records, and was informed Personally and with Letters, and Grievances and still did nothing to assist plaintiffs pleads for assistance, being "Deliberately Indifferent", to plaintiffs "Serious Medical Condition and Disability", acting at all times with a Culpable State of Mind and knew that there actions or inactions would have cause plaintiff a Substantial risk of Serious Harm both to Future and Current health.

Defendants were also on full notice of the Constitutional violation of Plaintiff with prior Court Proceedings against Defendants and Failed to remedy this wrong long before the deprivation of Plaintiffs Constitutional violations, and Supervisors Liability is a Cause of Action, see plaintiff Complaint Issue 1 Cause Of Action # 1, Wherefore Defendants Motion to Dismiss, should be denied in its entirety.

For all the reasons stated within Complaint and Plaintiffs Responding Opposition Papers.

### STATEMENT OF FACTS

Plaintiff prior to incarceration was stabbed multiple times, and experienced serious injuries to the Abdomen, requiring several surgical procedures, and removal of portions of the spleen and intestines.

Plaintiff was also stabbed on both Arms and Right Wrist, and the injuries to plaintiffs Right wrist and Arm included Diagnosed Nerve, Artery, and Tendon Damages resulting in the Ongoing of Pain, Numbness, Tingling and Weakness in the Entire Right Upper Extremity below the Shoulder, and required Removal of Portions of the Muscle, and the injuries to Plaintiff Left Arm resulted in Pain and Numbness in the Left Arm Muscle, to date.

Plaintiff was also Stabbed in the Lower Left Side Of the Back, and Suffers from Diagnosed Chronic Lower Back Pain, Caused by Issues in the lumbar Region of the Spine, with Chronic Pain in the Neck, Legs and Plaintiff also has Flat Feet, Causing further pain in the Back.

Prior to and currently Plaintiff was Diagnosed with Bipolar Disorder, and Anti-Social Personality Disorder, including Anxiety, Claustrophobia and Depression.

Plaintiffs Medical, Physical and Psychiatric condition Substantially Limited several Major Life Activities, including but not limited to Caring for oneself, Eating, Sleeping, Lifting, Communicating, Writing, Typing, Inability to Walk for Long Distances or Stand for Prelong Periods of time, all Individually and Collectively these Physical impairments Constitute a Disability Under the Americans With Disability Act, Titl II, and Section 504 of the Rehabilitations Act, all of which had been Decided by Honorable Barry E. Ryan, Administrative Law judge on March. 14, 2013, see attachment.

Defendants were provided Notice of Plaintiffs Medical Condition and Disability, on or about the day of January. 10, 2015 and at various points during plaintiffs Detention, and indeed Receiving Medical Confirmation of Plaintiffs Disabilities from medical Contractors Employed with the D.O.C.C.S, and Despite having Notice and being in possession of these Medical Documents and Personally informed by Plaintiff, at various points and times Acted "Deliberate Indifference", to Plaintiffs Serious Medical Condition and Disability, which

Exacerbated Plaintiffs Prior injuries and Causing additional Pain and Suffering, and in failing to Act and Remedy the wrongs done by Defendants, and being put on full notice by Plaintiff with Letters, Grievances and being personally informed, and creating a policy or custom that was mentioned in the Claim, the Supervisors were "Deliberately Indifferent", to plaintiffs Medical Needs and Condition, and by Failing to Reasonably Accommodate Plaintiffs Request without any Impact to Overall Institutional Concerns and Absent any Penological Interest, had denied Plaintiff of a Service, Programs and Activity, in violation of plaintiffs Right.

( See Attachment
  Social Security Administration
  Notice of Decision )

⑦

 **SOCIAL SECURITY ADMINISTRATION**

Refer To: ~~██████~~

Office of Disability Adjudication and Review
SSA ODAR Hearing Ofc
5th Floor
300 S State St
Syracuse, NY 13202-2056

Date: March 14, 2013

Ralph Rodriguez
Livingston CORRECTION-
Din # 10A4649
P.O. Box 91
Sonyea, NY 14556

### Notice of Decision -- Fully Favorable

I carefully reviewed the facts of your case and made the enclosed fully favorable decision. Please read this notice and my decision.

Although my decision is fully favorable, you have the right to an oral hearing and to examine the evidence on which I based my decision. Please contact the office listed above if you want to have an oral hearing or examine the evidence in your case record.

Another office will process my decision and decide if you meet the non-disability requirements for Supplemental Security Income payments. That office may ask you for more information. If you do not hear anything within 60 days of the date of this notice, please contact your local office. The contact information for your local office is at the end of this notice.

**If You Disagree With My Decision**

If you disagree with my decision, you may file an appeal with the Appeals Council.

**How To File An Appeal**

To file an appeal you must ask in writing that the Appeals Council review my decision. You may use our Request for Review form (HA-520) or write a letter. The form is available at www.socialsecurity.gov. Please put the Social Security number shown above on any appeal you file. If you need help, you may file in person at any Social Security or hearing office.

Please send your request to:

Appeals Council
Office of Disability Adjudication and Review
5107 Leesburg Pike
Falls Church, VA 22041-3255

See Next Page

Form HA-L76 (03-2010)

DEF 000566

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

## DECISION

<u>**IN THE CASE OF**</u>                                 <u>**CLAIM FOR**</u>

                                                         Period of Disability, Disability Insurance
Ralph Rodriguez                                          Benefits, and Supplemental Security Income
(Claimant)

(Wage Earner)                                            (Social Security Number)


### <u>JURISDICTION AND PROCEDURAL HISTORY</u>

On April 1, 2009, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on April 1, 2009. In both applications, the claimant alleged disability beginning September 19, 2008. These claims were denied initially on May 22, 2009. Thereafter, the claimant filed a written request for hearing on June 20, 2009 (20 CFR 404.929 *et seq.* and 416.1429 *et seq.*). On April 26, 2011, Administrative Law Judge Cofresi held a video hearing (20 CFR 404.936(c) and 416.1436(c)). The claimant appeared in Marcy, NY, and the ALJ presided over the hearing from Jamaica, NY. Charles M. Plotz, an impartial medical expert, also appeared at the hearing. Although informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative.

Subsequent to the completion of the first hearing, the then-adjudicator determined that a supplemental hearing was required to obtain the testimony of a vocational expert regarding whether there were jobs in the national economy that the claimant could perform with limited use of his right hand and arm. On August 23, 2011, he held a video hearing (20 CFR 404.936(c) and 416.1436(c)). The claimant appeared in Marcy, NY, and the Judge again presided over the hearing from Jamaica, NY. Steven H. Feinstein, an impartial vocational expert, also appeared and testified at that hearing session.

On September 14, 2011, the Judge issued an unfavorable hearing decision, determining that although the claimant was found to be "disabled," it also appeared his disability resulted directly from the commission of a felony for which he was subsequently convicted; therefore, no monthly benefits could be awarded. (Exhibit 3A)


**See Next Page**


**DEF 000567**

The claimant filed a request for review, and on December 19, 2012, the Appeals Council remanded, directing a re-determination in light of the fact it was unclear from the record exactly when the injuries in question were incurred, in relation to the timing of the commission of the felony. (Exhibit 4A)

This case is thus now before me on that remand from the Appeals Council. The evidence of record supports a fully favorable decision; therefore no supplemental hearing has been held (20 CFR 404.948(a) and 416.1448(a)). In the course of further development of this record, I and my staff have now determined that the convincing weight of the evidence indicates that the injuries, by way of stab wounds, were incurred in a distinct and separate incident, from that during which the claimant some time later responded to that attack with shots fired from a hand-gun. There was sufficient distance in time between the two events – though they arguably might have been seen by the original adjudicator as involving the same general altercation – to determine that the disabling injuries were incurred separately, and thus resulted in Social Security payable disabilities.

## ISSUES

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2013. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful review of the entire record, I find that the claimant has been disabled from September 19, 2008, through the date of this decision. I also find that the insured status requirements of the Social Security Act were met as of the date disability is established.

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

See Next Page

**DEF 000568**

Ralph Rodriguez                                        Page 3 of 12

At step one, I must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, or work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, I must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, I must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, I must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, I must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, I must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

See Next Page

DEF 000569

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, I make the following findings:

1.   **The claimant's date last insured is December 31, 2013.**

2.   **The claimant has not engaged in substantial gainful activity since September 19, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).**

3.   **The claimant has the following severe impairments: status-post surgery to repair penetrating wound to the brachial artery of the upper right arm; and residual restricted use of the right hand and arm. (20 CFR 404.1520(c) and 416.920(c))**

The claimant sustained damage to his right hand as the result of a knife attack that severed arteries, tendons and muscle. This resulted in a permanent loss of fine and gross manipulation skills and the loss of ability to lift more than five pounds and essentially rendered the right hand and arm useless. I find that this impairment significantly limits the claimant's ability to perform basic work activities and is therefore considered severe.

The claimant also alleged having a depressive disorder. Determining whether a mental impairment is severe requires the use of a Psychiatric Review Technique. Four broad functional areas have been identified to rate the degree of a claimant's functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

**See Next Page**

Ralph Rodriguez                                          Page 5 of 12

In rating the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace),the following five-point scale is used: None, mild, moderate, marked, and extreme. When rating the degree of limitation in the fourth functional area (episodes of decompensation), the following four-point scale is used: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

After we rate the degree of functional limitation resulting from a claimant's impairment(s), we will determine the severity of the claimant's mental impairment(s). If the degree of a claimant's limitation in the first three functional areas is "none" or "mild" and "none" in the fourth area, it will generally indicate that the claimant's impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. If a claimant's mental impairment(s) is severe, a determination will be made if it meets or is equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. The presence or absence of the criteria and the rating of the degree of functional limitation will be recorded on a standard document at the initial and reconsideration levels of the administrative review process. The presence or absence of the criteria and the rating of the degree of functional limitation will be recorded in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision), and in the decision at the Federal reviewing official, administrative law judge.

The first functional area is activities of daily living. In this area, the claimant has mild limitation. Michael Alexander, Ph.D., the psychiatric consultative examiner, noted in his report of April 24, 2009 (Exhibit 13F) that the claimant is able to dress bathe and groom himself. He takes public transportation independently. The claimant's problem holding things with his right hand does have some impact on his ability to cook, clean and shop but his mother helps occasionally with the cooking and cleaning and Dr. Plotz noted that the claimant can use his left hand without a problem to assist his right hand.

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant told Dr. Alexander that he does have close friends and is close with his mother sister and brothers in New York.

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The mental status examination revealed that the claimant's attention and concentration are intact. He was able to count, perform simple calculations and serial 3s. In addition the claimant told Dr. Alexander that he spends his days watching television and likes to listen to music, which requires concentration.

**See Next Page**

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration. Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is non-severe (20 CFR 404.1 520a(d)( 1) and 416.920a(d)( 1)).

I am mindful of the Psychiatric Review Technique Form ("PRTF") dated May 19, 2009 that was completed by Dr. A. Stockton, a non-examining consultative examiner (Exhibit 8F). Dr. Stockton opined that the claimant has a depressive disorder NOS that does not satisfy the listing criteria of Section 12.04. He opined that the claimant has a mild limitation in all functional areas and experienced one or two episodes of deterioration. I adopt Dr. Stockton's opinion regarding the claimant's "mild" limitation in the three functional areas but does not agree with his opinion that the claimant had one or two episodes of deterioration because that is not supported by the record.

In the alternative it is noted that if the claimant did have one or two episodes of deterioration and his mental impairment is deemed severe it would not be deemed disabling based on the instant record. The claimant was reportedly depressed over the incident with his wife and another man and the fact that he lost his job. However, the record does not contain any evidence that the claimant sought or received psychiatric counseling or that he is taking any psychotropic medications or anti-depressants. In sum, there is no evidence of any psychiatric treatment in the record. Further, Dr. Alexander, the psychiatric consultative examiner, opined that the claimant is capable of performing at least unskilled work and his inability to perform some complex tasks independently is due solely to his medical condition not his mental status.

Dr. Stockton also completed a Mental Residual Functional Capacity Assessment dated May 19, 2009 (Exhibit 9F). He opined that that in the three subcategories of Understanding and Memory, the eight subcategories of Sustained Concentration and Persistence and the five subcategories of Social Interaction the claimant had no significant limitations. In the four subcategories of Adaption the claimant's ability to respond appropriately to changes in a work setting and to set realistic goals or make plans independently of others was moderately limited. There were no significant limitations in the remaining two subcategories. I credit Dr. Stockton's assessment of the claimant's limitations all of the subcategories except for the two subcategories of Adaption referenced above. Dr. Stockton is a non-examining consultant who based his opinions on Dr. Alexander's examination. I do not find anything in the record or Dr. Alexander's report that would support Dr. Dr. Stockton's findings of the claimant's moderate limitations in the two subcategories of Adaption. In any event, it is noted that a moderate limitation would not necessarily prevent the claimant from performing job functions. I give significant weight to the remainder of Dr. Stockton's opinion.

**See Next Page**

DEF 000572

Ralph Rodriguez████████████                    Page 7 of 12

The claimant also has the following medically determinable impairments that did not significantly limit his ability to perform basic work related activities for twelve consecutive months and are therefore considered non-severe: status-post surgery to repair sigmoid colon perforation by resection; status-post operation to repair stab wound to the abdomen with colon injuries and liver laceration; status-post open reduction and internal fixation of symphysis fracture of the mandible; status-post right upper median nerve transection; abductor pollicis, extensor pollicis brevis, extensor pollicis longus tendon transsection; cutaneous nerve transsection; and depressive disorder (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

**4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

**5.   The claimant has the residual functional capacity with occupational base eroded to such a significant degree by the restricted use of his dominant right hand that he lacks the ability to perform even sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).**

In making this finding, I considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. I have also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-6p and 06-3p.

The evidence of record shows that the claimant was born on August 25, 1978 and was thirty years old on September 19, 2008 the alleged onset date and thirty-two years old on April 26, 2011 the date of the hearing. He has a GED Certificate and past relevant work as an environmental service aide in a hospital, which is similar to the job of a janitor.

The claimant testified at the original hearing in this matter that on September 18, 2008, he returned home to find his wife with another man. A fight ensued and the claimant was stabbed in the back, stomach and multiple times in the hands and arms. He stated that he lost half of his intestines and a quarter of his liver as a result of the stab wounds to his back; this is confirmed by the subsequent emergency room records. The stab wounds to his right hand and arm severed tendons, nerves and muscles resulting in permanently limited mobility of the right hand. The claimant said that he cannot move three fingers on his right hand and lacks the ability to grab or hold anything with his right hand and cannot lift more than five pounds.

The claimant also testified that he subsequently was able to get away and retrieve an unregistered handgun he kept in the house, and he then shot the other man twice – neither being a serious wound. He was later arrested and sentenced to three and a half years in prison, after plea-bargaining to attempted assault, a Class C felony.  He is presently serving his sentence.

See Next Page

DEF 000573

On the day of the incident, September 18, 2008, the claimant was air-lifted to Nassau University Medical Center because he lost so much blood. After admission to the hospital, the claimant underwent numerous operations and was discharged on November 7, 2008. The claimant stated that the worst injuries were to his back because they operated and removed half of his intestines and a part of his liver. After those operations, he developed a post-operative infection in his stomach and they had to perform another operation to remove the infected tissue. He also underwent two operations on his right arm and hand in an attempt to reattach severed arteries and nerves and to repair the tendons. The tendon repair required the removal of muscle which contributed to the reduced use of his hand. The claimant said that the operations on his hand and arm were not successful and that the injuries resulted in the limited use of his right hand which is a permanent condition. The claimant also stated that he is unable to bend because of injuries to his abdomen and stomach and he can no longer digest the proper nutrients needed to sustain a regular active day. He said that he is constantly fatigued, tired and has very limited energy. As a result, the correctional facility where he is incarcerated provides him with nutritional supplements to replace the nutrients that his body can no longer digest. Further, due to the loss of part of his intestines the claimant has to eat small portions because his intestines can get inflamed and swollen resulting in sharp pains in the area of the abdomen and stomach. The claimant testified that before he was incarcerated he was on prescribed pain killers like Lyrica, Percocet, Aprasinol and oxycodone, but when he was in custody the medical facility at the correctional institution discontinued these pain medications.

In response to questions posed regarding psychiatric impairments, the claimant testified that prior to his incarceration he saw a psychiatrist at Woodhull Hospital and received medication but decided that he did not want to pursue psychiatric treatment. At the supplemental hearing on August 23, 2011, the claimant testified that his physical condition had not changed since the last hearing. He confirmed that he is right-hand dominant and that his right hand is "partially dead." He acknowledged that he can brush his teeth and comb his hair but he cannot lift more than five pounds and could pick up only a piece of paper using his pinky finger and one other finger.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce most of the alleged symptoms.

Dr. Charles Plotz, the medical expert, was duly qualified and sworn. He testified that he has reviewed the entire record and has sufficient information to render an opinion regarding the claimant's medical status. He noted that the claimant's problems started on September 18, 2008 when he sustained injuries as the result of the stabbing. The most serious injuries were to his intestines and liver that resulted in a partial colostomy, a partial ileostomy and the removal of a piece of his liver. Fortunately, for the claimant the doctors were able to get everything back together again but then he suffered a post-operative infection. Dr. Plotz said that overall the claimant has done very well. He also stated that the claimant was stabbed in the right arm and sustained sufficient nerve damage to the point where it was noted that the claimant was unable to to oppose his thumb to his four fingers and is only able to make a 50% fist. Dr. Plotz testified that for all intents and purposes, the fine motor function of the claimant's right hand is lost forever but his left arm is functioning perfectly well. With the use of both arms he has limitation in lifting and is unable to perform fine functions with his right hand like tying a bow, or zipping a zipper, but he can do that with his left hand.

See Next Page

I noted that there was a time when the claimant had severe multiple injuries and was hospitalized on more than one occasion for surgical intervention and post-operative care. Considering the foregoing, I asked the medical expert if there was a time during which the claimant was generally unable to function. Dr. Plotz testified that it would be from September 18, 2008, the date of the incident, to May 1, 2009. He stated that the medical records indicate that by May 1, 2009, the claimant's intestinal problems had resolved and a consultative examination performed on April 30, 2009 gives an estimate of the range of motion of the right arm, the major remaining problem.

The claimant agreed that after May 2009 his intestinal problems had resolved but stated that his right arm has never healed. Other records confirm this. The records from Nassau University Medical Center (Exhibit 1F) noted the claimant's admission to the hospital on September 18, 2008 and his discharge on November 7, 2008 (Exhibit 1F, page 4). The diagnosis was stab wounds to the right brachial artery and the abdomen with colonic injury. He underwent an exploratory laparotomy with colon resection, small bowel repair and colostomy. He also underwent an operation to for a reduction of internal fixation of the mandible, and right median nerve and artery repair and reversal of colostomy.  At the time of discharge, the claimant received a prescription for Percocet.

Progress notes from Wykoff Heights Medical Center dated March 25, 2009 (Exhibit 2F) show that the claimant complained of pain in his right arm since September 2008. Right arm surgery, ileostomy and bowel resection are noted and the claimant was reported to be taking Vicodin and Percoset. The pain level was estimated at a steady 7/10. The claimant was given a referral to plastic surgery, pain management and neurology (Exhibit 5F) and placed on Voltaren.  At the next visit on April 17, 200 the pain level was rated at 5-7/10 (Exhibit 2F).

The claimant had his first follow up visit at the general surgery clinic of Nassau County Medical Center on December 19, 2008 (Exhibit 7F). The progress note reported that the claimant complained of abdominal pain, occasionally sharp, mostly at the affected wound site. It was also noted that the wound appeared to be healing. The claimant also has a reduced range of motion of the right forearm and second to fourth digits. The claimant testified that at one point he stopped receiving medical attention at Wykoff Heights Medical Center and started treating with Dr. David Carmili (Exhibit 3F) who referred him to a pain management specialist.  Dr. Carmili's progress notes for 2008, prior to the stabbing incident, shows that the claimant complained of back pain and underwent an electrodiagnostic lumbar study to rule-out nerve pathology. The test revealed very severe left upper lumbar nerve sensitivity and moderate sensitivity at the saphenous peroneal nerve and mild left sural nerve sensitivity. Dr. Carmili's notes indicate that he prescribed pain medications and physical therapy for the claimant during visits on November 24, 2008, December 29, 2008, and February 11, 2009, all of which were subsequent to the stabbing incident. In a "Return to Work" note dated December 29, 2008 (Exhibit 6F) Dr. Carmili wrote that the claimant was under his care for refill on medication. He was also under the care of a neurologist, and could not return to work.

**See Next Page**

DEF 000575

Dr. Jerome Caiati, a consultative examiner with a specialty in internal medicine, evaluated the claimant on April 24, 2009 (Exhibit 4F). Dr. Caiati found lumbar spine flexes ninety degrees, extends thirty degrees, lateral flexes thirty degrees and rotates seventy degrees. Right shoulder abducts forty-five degrees. Right elbow flexes one hundred forty degrees, extends one hundred forty degrees. A sensory deficit was noted in the right arm 2 to 3/5. Right and left hips flex one hundred ten degrees, internal rotate twenty degrees. External rotation was ninety degrees. Fine motor activity of the hands showed that the right hand extends perhaps seventy percent but made a fifty percent grip. The claimant is unable to oppose thumbs to the other four fingers. Grip strength is 3 to 4/5 on the right. In addition, he is unable to tie a bow, button a button, zip a zipper and hold large objects using the right hand. The examiner opined marked limitation with the right arm.

I give significant weight to the opinion of Dr. Caiati. He had an opportunity to obtain a complete medical history from the claimant and conduct a thorough physical examination. Further, his opinion is supported by the evidence of record.

After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

At the supplemental (original) hearing, the vocational expert testified that the claimant described his past relevant work as an Environmental Service Aide. However, the Dictionary of Occupational Titles ("DOT") describes the work as Hospital Cleaner. It is assigned DOT code number 323.687-010 and has an SVP of 2 and medium exertional requirement. The vocational expert testified that the job requires frequent reaching, handling, and fingering, occasional bending and crouching and the ability to carry up to fifty pounds occasionally and twenty-five pounds frequently. He stated that based on the claimant's current residual functional capacity assessment he would be unable to perform his past relevant work.

7.     The claimant was a younger individual age 18-44 on the established disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

See Next Page

DEF 000576



In determining whether a successful adjustment to other work can be made, I must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.27. To determine the extent to which the claimant's additional limitations erode the unskilled sedentary occupational base, the Administrative Law Judge analyzed the testimony provided at the original hearing in this matter, by the vocational expert, who was at that time asked whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.

The vocational expert identified the following jobs, appearing initially perhaps possible for such an individual: usher; and surveillance system monitor. But the vocational expert testified that the job of usher requires occasional fingering. I asked the vocational expert if the individual could perform the jobs cited above if he could not lift/carry more than five pounds frequently and occasionally. The vocational expert testified that he could not perform any of those jobs. The jobs at the light exertional level require the ability to lift ten pounds frequently and twenty pounds occasionally. He also noted that the job of surveillance system monitor requires lifting up to five pounds occasionally. The vocational expert testified that the job of usher requires occasional fingering and that they all require the use of both hands.

The vocational expert testified that given all of the factors described above there are no jobs in the national economy that the individual could perform.

Based on the updated testimony of both the vocational expert and the claimant it appears that the deciding factor is the claimant's lack of use of his right hand for lifting and carrying and performing fine manipulations. The jobs cited by the vocational expert have a light and sedentary exertional requirement, which involves a lift/carry component that the claimant is unable to perform. Therefore the right hand impairment is a permanent disability and meets the twelve month durational requirement and based on the testimony of the vocational expert precludes him from all work activity.

The vocational expert responded that given all of these factors there are no jobs in the national economy that the individual could perform.

**See Next Page**

Ralph Rodriguez ██████████                              Page 12 of 12

I furthermore note that the vocational expert's responses were in accord with the industry standard reference works, particularly the DOT.

**11. The claimant has been under a disability as defined in the Social Security Act since September 19, 2008, the alleged onset date of disability (20 CFR 404.1520(g) and 416.920(g)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits protectively filed on March 18, 2009, the claimant has been disabled under sections 216(i) and 223(d) of the Social Security Act, since September 19, 2008.

As of the application for supplemental security income filed on April 1, 2009, the claimant has been disabled under section 1614(a)(3)(A) of the Social Security Act.

The component of the Social Security Administration responsible for authorizing supplemental security income will advise the claimant regarding the non-disability requirements for these payments and, if the claimant is eligible, the amount and the months for which payment will be made.

In addition, I note that this case is subject to benefit suspension during the remainder of the claimant's current period of incarceration.

/s/ *Barry E. Ryan*
Barry E. Ryan
Administrative Law Judge

March 14, 2013
Date

**DEF 000578**

Note for Ralph Rodriguez on 7/16/2013 - Chart 2483

**Chief Complaint: Chief Complaint (1/5):** This 34 year old male presents today with complaints of pain.
**Chief Complaint (2/5):** He also presents with complaints of painful left upper quadrant of abdomen.
**Context:** Pain occurred as a result of patient admits assult reporting multilplle stab wounds to back and right arm
Patient with atrophy to his right arm
Patient was incarcerated for 2.5 years and released in July  Patient under the care of primary physician
Patient has failed physical therapy
**Severity:** Severity of condition is the present level of pain is a grade 9/10.
**Timing (onset/frequency):** The patient describes the pattern of pain as continuous.
**Duration:** Condition has existed for 12 months.
**Pain Areas in %'s:** He describes percent of pain in the following areas: 50 % Lower back, 60 % right Arm and 80 % Abdomen.
**Modifying factors:** Modifying Factors: Patient indicates Oswestry Scale - Lifting (4) only very light weights, Oswestry Scale - Walking (3) can not walk more than one-quarter mile and Oswestry Scale - Sitting (3) can not sit more than thirty minutes.
**Quality:** Quality of the pain is described by the patient as sharp.
**Chief Complaint (3/5):** He also presents with complaints of painful abdomen.
**Chief Complaint (4/5):** He also presents with complaints of painful back and left buttock.
**Chief Complaint (5/5):** He also presents with complaints of painful right hand.

**Allergies:** No known medical allergies.
**Medication History:** Active: OPANA (active); usage usage started on 6/16/2010 medication was prescribed by Zenetos, Panagiotis MD, OPANA ER (active), Lyrica 150 mg Capsule (60.) (active), oxycodone 160 (active), oxycodone 30 mg Tablet (120.) (active); usage usage started on 6/16/2010 medication was prescribed by Zenetos, Panagiotis MD.
**PMH:** Past medical history is unremarkable.
**Past Surgical History:** Explaratory laparotomy multiple times , colostomy with reversal, right arm surgery nerve repair
**Family History:** Unremarkable.
**Social History:** Patient admits tobacco use. He reports smoking history of 5 pack years.
**Review of Systems:** Unremarkable except for Chief Complaint.

**Physical Exam:** Patient is a pleasant, 34 year old male in moderate distress who looks his given age, is well developed and nourished with good attention to hygiene and body habitus.
**Cardiovascular:** Normal S1 and S2 without murmurs, gallop, rubs or clicks.  Examination of peripheral vascular system reveals varicosities absent, extremities warm to touch, no edema, no abnormalities and pulses are full to palpation. Cap. fill time is immediate.  Pulses: The femoral, popliteal, dorsalis pedis and posterior tibial pulses are normal and equal in the lower extremities.
**Respiratory:** Lungs clear to auscultation withl no wheezes, rales or rhonchi noted.
**Lymphatic:**  Groin lymph nodes are normal. Axillary nodes exam is normal, Neck nodes exam

Page: 1

DEF 000579

Rodriguez, Ralph 7/16/2013 - 2483                                    Panagiotis Zenetos MD

is normal.

**Musculoskeletal:** Right foot inverters and left foot inverters muscle strength is 5/5 and 4/5.
Left foot plantarflexors, left foot everters and right foot everters muscle strength is 4/5. Right
wrist extensors, right wrist flexors, right triceps, right biceps and right shoulder abductors muscle
strength is 3/5. Left wrist extensors, left wrist flexors, left triceps, left biceps and left shoulder
abductors muscle strength is 5/5.

Lumbar ROM shows decreased flexion with pain, decreased extension with pain, decreased LLF
with pain, decreased RLF with pain, decreased LR with pain, decreased RR with pain. Posterior
aspect of neck, right upper back, left upper back, right lower back and lumbar region shows
palpatory paraspinal tenderness bilateral. Straight-leg raising test is abnormal with radiating pain
@ 30 degrees. Cervical ROM shows decreased flexion with pain, decreased extension with pain,
decreased L Tilt with pain, decreased R Tilt with pain, decreased L Rotation with pain, decreased
R Rotation with pain.

Right wrist ROM shows decreased flexion with pain, decreased extension with pain, decreased
ulnar deviation with pain, decreased radial deviation with pain.

**Skin:** No skin rash, subcutaneous nodules, lesions or ulcers observed. Palpation of skin shows
no abnormalities. **Psychiatric:** Oriented to person, place and time. Mood and affect normal and
appropriate to situation.

**Neurological:**

   **Cranial Nerves:** Cranial nerves are grossly intact.

   **Reflexes:** right biceps reflex and right triceps reflex is 0/4 with reinforcement. Right
achilles reflex, left achilles reflex, left biceps reflex, left triceps reflex, left patellar reflex
and right patellar reflex is 1/4 with reinforcement.    **Sensory Exam:** C7 dermatome and C6
dermatome demonstrates light touch sensation decreased.

**Gastrointestinal:** Abdomen soft, nontender, bowel sounds present x 4 without palpable masses.

**Impression:** The diagnosis is Myofascial pain lumbar spine and Cervicothoracic pain syndrome,
Radiculopathy, Cervical and Radiculopathy, Lumbar. Abdominal pain
**Plan:** Physical therapist was given orders to evaluate patients condition and treat accordingly.
**Diagnostic & Lab Orders:** Ordered MRI of the spinal canal and contents, cervical without then
with contrast and spinal canal and contents, lumbar without contrast.
Opioid contract signed: Yes,No,n/a

Prescriptions:
flexeril 10mg #90
Rx: oxycodone- 30 mg Tablet, 120 Refills: 0.  Allow Generic: Yes
Lyrica 150 bid #120
skelaxin 800mg tid #90

Signed by _____  Panagiotis Zenetos, MD

Page: 2

DEF 000580

## STANDARD OF REVIEW

In deciding a Rule 12(b)(1) and (6), the Court evaluate the Sufficiency of the operative Complaint Under "The Two-Prong Approach", articulated by the Supreme Court in Ashcroft V. Iqbal, 556 U.S. 622, 679 (2009)

The Court must "Liberally Construe", submissions of Pro-Se litigants and "Interpret them" to raise the "Strongest Arguments", that they suggest, see Triestman V. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir 2006).

Plaintiff pleading "Factual Contents", supported with exhibits and Sworn Affidavits, had provided this honorable Court with enough evidence and information to draw the reasonable inference inference that the Defendants is liable for the misconduct alleged, being ", "Facially Plausible", not "Possible".

Applying the pleading Rule permissively is particularly appropriate when, as here, Pro-Se litigant has alleged Civil Rights Violations, see Sealed Plaintiff V. Sealed Defendants, 537, F.3d 185, 191 (2d Cir 2008), and with the Sworn Affidavits, Exhibits and Factual Contents that state a cause of action against Defendants.

The Court on ruling on a Motion to Dismiss, Accept as true All of the allegations contained in the Complaint, see Erickson V. pardus, 551 U.S. 89, 94 (2007), and draw "All reasonable Inference in favor Of Plaintiff", see Daniel V. T & M Prot. Res. Inc, 992 F.Sup 2d 302, 304 N.1 (S.D.N.Y 2014) (Citing Koch V. Christie's Int'l PLC, 699, F.3d 141, 145, (2d Cir 2012).

Additionally, in adjudicating a Rule 12(b)(6) motion, a District Court must confine its consideration to facts stated on the face of the Complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which Judicial notice may be taken, see Leonard F. V. Isr. Disc. Bank Of N.Y, 199 F.3d 99, 107 (2d Cir 1999), see also Wang V. Palmisano, 157 F.Supp. 3d 306, 317 (S.D.N.Y 2016).

Additionally, when the Complaint is drafted by a Pro-Se Plaintiff, the Court Considers "Materials outside the Complaint to the extent that they are Consistent with the

allegations in the Complaint, see Alsaifullah V. Furco, No. 12-CV-2907, 2013 WL 3972514 at *4 n.3 (S.D.N.Y Aug. 2, 2013)

Additionally, this includes "Documents that a Pro-Se Litigant attaches to His Opposition Papers", see Agu V. Rhea, No. 09-CV-4732, 2010 WL 5186839, at *4 N.6 (E.D.N.Y Dec.15,2010)

The "Judicial Notice", is any Case's dealing with the "Same issues, Defendant's and or Constitution violations", that Defendant's under Supervisor Liability Claims would put them on notice of the violations and failing to remedy a wrong satisfying the "Personally Involved" and was "Grossly Negligent", prong set fourth in, see Williams V. Smith, 781 F.2d 319, 323-24, (2d Cir 1986), and making a relief "Facially Plausible".

When a Supervisor fails to act on information indicating Unconstitutional Acts Occurring and fails to act, satisfy the "Deliberate Indifference", standard set fourth in the Second Circuit, See Poe V. Leonard, 282 F.3d 123, 140 (2d Cir 2002).

Plaintiff did not submit a Claim with "Conclusory Allegation", and did not provide the Court with "Merely recites and words implying violations", as the District Attorney had implied in Defendant "Motion to Dismiss", and had "Twisted Around" plaintiffs Claim and facts, as is customary with Defendants "Motion to Dismiss", and instead, plaintiff had provided "Factual Information", that along with the Exhibits and Sworn Affidavits made a "Plausible Claim", satisfying the Two Prong Approach", discussed in, Ashcroft V. Iqbal, and just because Plaintiff is Pro-Se and not familiar with all the Rules and Wording used by Certified Lawyers, should in no way be held in a Standard similar to the one the District Attorney had expected of Plaintiffs Claim, but in this Answering Opposition Plaintiff had attempted to provide the Court with Curative Measures to Correct these errors the Defendants had mentioned in there Motion to Dismiss, that is Consistent with the Allegations mentioned in the Complaint, see Alsaifullah V. Furco, including documents attached to this Opposition papers, see Agu V. Rhea.

# A R G U M E N T

## OPPOSITION TO DEFENDANTS POINT # 1

Plaintiffs Complaint had contained Factual Allegations, although a Complaint "Does Not Need Detailed Factual Allegation", Plaintiff had stated adequately the complaint supported with sets of "Fact", supported with Exhibit, Sworn Affidavits and enough details to make a Claim "Plausible on its Face", and any insufficiencies "will be Addressed", in this Motion in Opposition to Dismiss.

Plaintiff had provided information showing how each Defendant was "Personally Involved" in the violations to Plaintiffs rights.

Plaintiff had attempted to explain as much facts in detail to make the Claim Plausible on it Face, including who, what, where, when and how, these actions or failure to act had violated plaintiffs rights.

The Complaint along with this Motion in Opposition to Dismiss had made a showing for a Cause Of Action against Defendants.

## OPPOSITION TO DEFENDANTS POINT # 2

Plaintiffs Complaint Incident 1 and Cause Of Action 1, is "NOT REQUESTING A CAUSE OF ACTION FOR THE IMPROPER HANDLING OF PLAINTIFFS GRIEVANCES",and once againt the Defendants had inaccurately read and construed Plaintiffs complaint to reflect a cause of action that was not the "heart of the issue", and is customary of Defendants to mix around Pro-Se litigants words and complaint.

Plaintiffs Cause Of Action for Incident #1, is for "Supervisor Liability", providing information of "Why" Plaintiff was unable to Fully Exhaust, and how Defendants Burnett, Akinyombo, Frost, Gonzalez, Reams, Waylon, Urbanski, and Woods whom were official that were charged with the Responsibility for the lower officials act's and Being personally involved in a Constitutional Violation, because after learning of the violations being done to Plaintiff, and by failing to remedy the wrong and/or created a Policy or Custom under

which Plaintiffs Constitutional Rights were being violated and/or Allowed such a policy
or Custom to continue and/or was "Grossly Negligent" in that Defendants did not Adequately
Supervise there Subordinates who violated plaintiffs rights, see William V. Smith, 781 F2d
319, 323-24 (2d Cir 1986).

Incident 1, Cause of Action 1 in Complaint made a Facially Plausible Showing that the
Defendants was Informed about medical failures to adequately treat plaintiff and Denied a
reasonable accommodation, as well as the Conditions Of Confinement, Denial of access to
the law library, supplies and Notary, as well as all the issues within complaint had
been put on notice with the Grievances, letters and being personally informed by plaintiff
and did nothing to help, and by allowing Defendant ms Reams to act as a "Shield against
litigation", knowing full well that failure to exhaust can lead to a valid Claim be
Dismissed, without the proper language and Evidence showing that there was no such
Administrative Remedies available, as was the case in Plaintiff Clain, to insure that the
Court understood the severity of the situation at Fishkill Correctional Concerning the
Grievance system that was allowed to continue running in such a manner, See (Exhibit B).

Plaintiff knowing full well the importance of the Grievance system and had submitted
enough Grievances to know rules of the P.L.R.A, and provided as much information as
possible to show the Courts that "ALL ATTEMPTS TO EXHAUST WAS MADE", in regards to the
P.L.R.A and how defendants actions and or failure to act made them liable for Civil Rights
violations against them.

Plaintiff knows full well there is no Constitutional protections against Grievances, but
there is a First Amendment protection against being denied the ability to "PETITION THE
GOVERNMENT FOR A REDRESS OF GRIEVANCES", and defendant Reams had violated Plaintiffs
Constitutional Right to do so, because in order to move forward with a "petition the
government with a redress of Grievances, because in order for them to actually address an
issue, the issue must go through the Grievance system first within the Facility, See
(Exhibit C).

Wherefore all the reasons stated Defendants should be found liable under "Supervisor
Liability", and all Plaintiff attempts to Grieve issues under P.L.R.A be satisfied.

Plaintiff is also relying on "Prior Court Proceedings", against the Defendants making a "Plausible Showing", that at all times the Incidents and Cause Of Actions to Plaintiffs Claim has long been going on Prior to the Constitutional violations Done to Plaintiff, and Defendants were always aware of the issues, and in a position to correct the wrong, and Failed to act to remedy the wrongs written within Plaintiffs Claim.

Excessive Force, unconstitutional Condition of confinement, Cruel and unusual Punishment, Deliberate indifference to Medical Needs, Due Process, Law Library Access Denial and inadequate, Tampering and making False Reports, Officers acting outside there Scope Of Duty, Failure to Protect, Grievance Being Corrupt, Even Murder by the hands of Officers, all of the Cases below are Against Fishkill Officials and their actions listed above.

See., Harell V. New York State Department Of Corrections and Community Supervision, No. 15-CV-7065 (RA), 2019 WL 3821229.

Nicholas Magalios V. Mathew Peralta, No. 19-CV-6188 (CS), 2022 WL 407403.

Thompson V. Booth, No. 16-CV-3477 (KMK), 2018 WL 4760663.

Green V. Correctional Emergency Response Team, No. 22-Cv-4631 (CS), 2022 WL 2160372.

Lurch V. Bui, 9:19-CV-895 (DNH/DJS), 2020 WL 1169364.

Wilson V. Snyder, No. 9:19-CV-420 (DNH/CFH), 2019 WL 8192227.

Abdallah V. Ragner, No. 12-CV-8840 (JPO), 2013 WL 7118083.

O'Connor V. Featherston, No. 01-CV-325 (HB), 2003 WL 554752.

Shaw V. Ortiz, No. 15-CV-8964 (KMK), 2016 WL 7410722.

Kendall V. Cuomo, No. 12-CV-3438 (ALC)(RLE), 2013 WL 5425780.

See Also 2005 Prison Monitoring Report: Fishkill Correctional Facility, Correctional Ass'n of N.Y. at 1, 3-5 (Feb. 15, 2005).

This is just a few of the cases Plaintiff has read dealing with, some of the same officials at Fishkill Correctional, and there Continued violations of multiple prisoners Rights, and to date, Official continue to allow such malicious acts to continue, Wherefore the Defendants Failure to train, Remedy a Wrong that they New was Occurring and allow for an unwritten policy and Custom to continue being Grossly Negligent making them Responsible Under "Supervisor Liability" being personally involved with Plaintiffs Claim and violation.

(12)

was quickly confiscated by Defendant Gibbons, and once again shows how Defendants Counsel had made false accusations about Plaintiffs Claim.

The Complaint made in issue 2 and 7 along with the cause of action, is "IN NO WAY A CLAIM FOR CHOICE OF TREATMENT", but instead a showing of how "Deliberately Indifferent" the Defendants were to plaintiffs health, Safety and Medical needs because plaintiff had been on proper medication prior to entering Fishkill Correctional, and because of the direct actions of defendant Sullivan to discontinue and not prescribe the medication plaintiff was on that was "Actual Medication for Nerve Damage" being Lyrica and or Gabbapentin and prescribing Moloxicam which is "NOT A NERVE MEDICATION BUT AN ANTI-INFLAMMATORY" medication shows plausibly that her Nurse Practitioner expertise does not include being an expert in the field of Neurology, and request to see a specialist was ignored.

Since Plaintiff became an Incarcerated Individual had in every facility gotten an Egg crate and/or extra mat, once the medical information and documents was shown by Plaintiff, see (Exhibit D), but due to the Deliberate indifference of Defendants that knew to stop giving plaintiff the proper medication and medical device would have caused severe harm without any legitimate reason why other than retaliation against plaintiff for writing up defendant ms Sullivan, Akinyombo, and waylan was done so with the intent to cause harm.

Plaintiffs incident 2 and 7 in the claim is not a claim against the medication wanted but a showing of how clearly negligent Sullivan was in prescribing the wrong medication, and had plaintiff gotten the reasonable Accommodation of an Egg Crate then the exacerbation of Plaintiffs medical condition and health would have never occurred which then required medication, and once again Defendants Counsel had twisted Plaintiff Claim, and made it a Cause Of Action that can not be granted, which is typical in a motion to Dismiss, and is why Plaintiff has addressed this issue once again to ensure that the "Focus Of Incident 2 and 7, is not misconstrued with the false allegations of defendants counsel, and the incidents be read as was meant, to make a clear showing that defendants was "Deliberately Indifferent", to Plaintiffs "Serious Medical Needs", which caused severe pain and

OPPOSITION TO DEFENDANTS POINT # 3
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

Plaintiffs Second and Seventh Incident and Cause Of Action, provided enough facts to State a Claim to relief that is plausible on its face, with a showing of how Defendant ins Sullivan, Akinyombo, and Waylon, all being Medical personnel and was informed of the issue of plaintiffs medical care and need, and even after being told, written to and Grieved, did nothing to assist plaintiff.

Plaintiff stated sufficient facts to demonstrate an "Objectively Serious Medical Risk", please read "Statement Of Facts", detailing the Seriousness of Plaintiffs Medical Condition and Disability, and Defendants mentioned are all medical professionals and know of and are fully aware of the facts written in the statement of facts, and knew that to First deny plaintiffs request for an egg crate or mat, with the seriousness of plaintiffs medical condition and disability, would have caused the exacerbation of plaintiff health and safety to future health, and was given and shown medical documents to validate these issues and still decided to deny plaintiffs reasonable request, and refused to assist and the seriousness of plaintiffs medical condition was Detailed and documented in Rodriguez V. City Of New York, No 15-CV-07945, 2018 WL 1276826, which plaintiff had copied and sent to all defendants within this claim, and still they did nothing to assist, and this was a "Deliberate Indifference", to plaintiff medical need, and at all times the actions and failure to act by Defendant Sullivan, Akinyombo, Waylan, and Burnett was not only Deliberate indifference but a complete disregard to the severity of plaintiffs medical condition and disability, and at all times they knew or should have known that to deny plaintiff would result in the Unwanton infliction of pain and suffering which required physical therapy to assist with the pain.

The need of plaintiff to do physical therapy and be placed on medication is a plausible showing that the injury incurred by the lack of medical care was "SERIOUS".

Defendants also made allegation that in plaintiffs complaint at 63 and third cause of action, that a nurse had provided plaintiff with an extra mat "IS FALSE", please read the complaint where it states "Clearly that another inmate got plaintiff an extra mat", which

Suffering in violation of plaintiffs Eight Amendment, doing so with a Culpable State Of Mind.

Due to defendants actions and or failure to act, Plaintiff had experienced "Extreme Pain and Suffering", that consisted of Back Pain, Neck Pain, Headaches, Numbness, Trouble Sleeping, Feeling of Tired and Weakness, joint Pains, Loss of Appetite, Loss of Weight, Tingling Feelings that caused Pain to Right Arm, Changes in Mood, and Depression, all that had occurred because of Defendants refusal of a Reasonable Accommodation, and because defendants taking of Plaintiffs Medical Devise, and refusal to Place Plaintiff in Physical therapy till years later, and refusal to follow the Orders of a Pain Management Expert that made recomendation=s for medication that defendants refused to place plaintiff on, outside there field of expertise.

To Date Plaintiff still does not know "Why", Defendants made no attempts to Accommodate Plaintiffs Reasonable Request for an Egg Crate or Extra Mat, other than Malice and Deliberate indifference to a serious medical need, and nothing short than intentions to cause harm, which had occurred was done, and Plaintiff is in Hopes and Prayers that this honorable Court allows for these claims to move forward so the defendants can answer "WHY" they Acted or failed to Act, knowing to do so would have caused the damaged done.

OPPOSITION TO DEFENDANTS POINT # 4
_____

Plaintiffs Third Incident, Third Cause Of Action, had Sufficiently pleaded "Facts

Suggestive Of Wantonness", and Demonstrated Retaliation against defendant Officer Gibbons.

Officer Gibbons had known of the Assault that had occurred the day prior to multiple

inmates including Defendant, and seeing that Plaintiff was the "Only Inmate Not Taken", to

the box (S.H.U), and knew that because of Plaintiffs Medical Condition and Disability that

the officials involved in the brutal assault on Plaintiff would be unable to

explain there actions and justification for doing so, left Plaintiff alone, and had not

written any disciplinary action against Plaintiff.

Officer Gibbons being an officer at Fishkill for a number of years and worked the housing

unit, knows full well that Plaintiff had in the past written multiple Grievances against

official whom "Act Outside Their Scope Of Duty", including officer Gibbons, and for that

reason, including others, and was fully informed by her piers of what had occurred at the

housing unit, and she took adverse actions against Plaintiff, and did so "Outside Her

Scope Of Duty".

Officer Gibbons seen other inmates within the unit using extra mats because of the mass

assault against so many inmates within the unit, left about six beds open, and not one

mat was on those beds because other inmates within the unit was using them, and officer

Gibbons walked right by those inmates seen them using the extra mat, but purposely and

intentionally targeted Plaintiff, whom not only is Legally entitled to use an extra mat,

see Rodriguez V. City Of New York, but it was a Medical Necessity, and at no time did she

called Medical after Plaintiff explained why I was using it, to verify Claimants excuse

and to ensure it was warranted to use the extra mat, but instead, told Plaintiff to get up

out of my bed, seeing my Ankle Wrapped up in an Ace Band as well as my Wrist, and was

"Deliberately Indifferent", to Plaintiff Medical need and Condition, and when Plaintiff

had ask my neighbor for assistance, Officer Gibbons, Put On Her Gloves, and escorted

Plaintiff "Outside the Housing Unit", and Ordered Plaintiff to Stay Standing Staring at

wall till she was done Flipping plaintiffs Cubical, and when Plaintiff informed her that

due to the injuries and even prior to the injuries Plaintiff is unable to Stand for any prelong period of time, see (Exhibit E), and this information is in the Correctional officers bubble of every housing unit, having the medical condition and limitations of the inmates within there Units.

"Not only was Gibbons acting outside her Scope of Duty", the first thing she is required to do after Plaintiff informed her, was to call Medical to validate Plaintiffs reason, or at the very least check the inmate medical restriction and limitations, both which she intentionally avoided to do.

She then ordered Plaintiff to stand at the wall and stair at it with the treat of pulling her pin and shoved plaintiff towards the wall, and Plaintiff in fear of my safety followed her orders, and after on or about 15 minutes Plaintiff fell hitting the wall getting injured, and inmates had informed her and Gibbons came, and attempted to "Order Plaintiff" up off the floor, but due to the injuries she pulled he pin, and in no way was she doing so in an attempt to help plaintiff as the Counsels Motion to Dismiss attempted to allege, but she pulled her pin because Plaintiff refused to till Medical assistance came, and she "had to" call for assistance, but in no way did she "Want to", and if not for other inmates seeing what happen she would have left Plaintiff there, as was her intentions all along was to intentionally harm Plaintiff, and at no time was any of her actions within her Scope of duty.

Plaintiff has a Right to file any Grievance or Complaint against an official if wrong doings has been committed, and Plaintiff now currently being in Fishkill Correctional had never had issues such as with Officer Gibbons, who has Multiple Grievances and Complaints against her, and "TO DATE", officer Gibbons continue to harass and Retaliate against Plaintiff, see (Exhibit F).

On 9-13-22 Plaintiff had to file another Grievance against Officer Gibbons for Harassment Grievance # 0292-22, and on 9-16-22 was interviewed by Lieutenant Carlesimo, Fully informing him of Officer Gibbons Actions, and Plaintiff even sent a Letter to the D.A Andrew Blancato, informing him that his defendant continues to Harass and threaten

Plaintiff, and when the Lieutenant asked me what resolution I was seeking Plaintiff simply requested to be "Left Alone", and Caresimo said he will talk to her, and **on** 9-20-22 he did, and shortly after Officer Gibbons came storming in the housing unit screaming out, "Where's Rodriguez, Where's Rodriguez", going up and down the housing unit looking for plaintiff but plaintiff was not in the housing unit and Gibbons, entered my room and trashed my room damaging my personal Belongings, and left the housing unit.

When Plaintiff came back to the housing unit a large amount of inmates informed Plaintiff of what had occurred and Plaintiff quickly called O.S.I (Office Of Special Investigations) and reported her and her actions and wrote another Grievance and a Letter informing the Lieutenant of what had happened, see Exhibit E, and while plaintiff was in my room # 26, at or around 10:30 pm Plaintiff was reading a book, and suddenly the rooms master light was put on, and the door was flung open banging against the wall and Officer Gibbons once again threatened Plaintiff, and on or about 9-22-22 Plaintiff went to Mental Health to speak to my Mental health care provider and had all of this documented and informed her, that officer Gibbons actions out side her scope of duties was causing plaintiff extreme mental health issues, such as Anxiety, Fear of further Retaliation, Depression, unable to sleep, loss of appetite, and more issues that the psychiatrist wrote down.

On or about 9-22-22 Lieutenant Carlesimo called Plaintiff again and when I informed him of what had occurred he was extremely upset, and requested names of inmates who seen Officer Gibbons go into my Room and can validate my claim, and Plaintiff gave him the name of three inmates whom seen everything one of them being Gamble Din #17A2851, and the Lieutenant called gamble, question him and validated the incident.

Wherefore aside from the incident that had occurred prior to date Plaintiff is still going through the Malicious Sadistic wrath of this Mentally unstable Official Alexandra Ayana Gibbons, and am in hopes that the information provided is enough to prove her that at all times her intentions were of Malice and Sadistic, and Continues to Occur, in violation of Well established Laws, Directives and Policies, in Violation of Plaintiffs Rights to be free From, Assault, Battery, Harassment, Threats and Retaliations from petitioning the courts, and writing of Grievances and Complaints against an Official.

OPPOSITION TO DEFENDANTS POINT # 5

The Doctrine of Qualified immunity shields officials from Civil Liability "So Long As Their Conduct Does Not Violate Clearly Established Statutory or Constitutional Rights", which a Reasonable Person would have known, See Mullenix V. Luna, 577 U.S. 7, 11, 136 S.Ct 305, 193, L.Ed.2d 255 (2015), and the Objective Reasonableness of the Officials actions Challenged in the Light Of Clearly Establish Laws, See Anderson V. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97, L.Ed.2d 523 (1987).

In the Light Most Favorable to the Plaintiff, Plaintiff has provided enough facts making a Plausible Showing that the Defendants violated Plaintiffs Rights, and the Rights of Plaintiff was "Clearly Established", and in no way was the officials Actions or Inactions "Objectively Reasonable" for the officials to believe the conduct was lawful, See Gonalez V. City Of Schenectady, 728 F.3d 149, 154 (2d Cir 2013).

To be Clearly established, a legal principle must have a Sufficiently Clear Foundation in then-existing precedent, See District Of Columbia V. Wesby, U.S 138, S.Ct 577, 589, 199, L.Ed.2d 453 (2018).

A Right is Clearly Established when it is "Sufficiently Clear that every Reasonable official would have understood that what they was doing or not doing violated that Right" See Mullenix, 577 U.S at 11, 136, S.Ct 305.

A view of the Facts in Plaintiffs Claim and Opposition papers, including Exhibits, Sworn Affidavits, and Detailed Accounts of the Incidents, in the light most Favorable to a Pro-Se Plaintiff, and a Review of the Complaint and Opposition papers, to Draw the Strongest issues possible, and the production of such sufficient evidence to establish that there is in "Fact a Genuine Issue Of Material Facts for Trial", See Anderson V. Liberty Lobby, Inc, 477 U.S. 242, 249 (1986), and as a matter of law it would be impossible for a Reasonable Jury to Conclude that the Defendants actions and/or Failure to act, unlawful Conduct, Deliberate indifference, Culpable state of mind, acting outside the Scope of their Duty, was in fact induced by improper Conduct of clearly established Law.

Wherefore Qualified Immunity Should be Denied in its Entirety for all Defendants.

OPPOSITION TO DEFENDANTS POINT # 6
--------------------------------------

Plaintiff has "Sufficiently Pleaded Personal Involvement Of Defendants", by them being
"Personally Informed" all except Defendant Waylon, whom Plaintiff never had a Chance to
see, but "ALL" defendants was informed via "Letters Written", "Grievances Made", and
by "Prior and Current Litigations", against Defendants which Plaintiff has included
within moving papers.

There was Sufficiently Pleaded Facts within Plaintiffs Complaint and Opposition, to
conclude that Defendants was well aware of the incidents and issues Plaintiff has Raised,
and any Reasonable jury would conclude the same.

Under the Supervisor Liability claim, Plaintiff had included evidence that can be
concluded that each and every Defendant was aware of the situation and through the
officials own actions or failure to act through the Officials own Individual Acts has
failed in their duty, by "After Learning of a violation of Plaintiffs Rights had Failed
to Remedy the wrong", and by "Creating a Policy and/or Custom and/or allowed for such
policy and/or custom to continue" which violated Plaintiffs Rights, and the Supervisors
were "Grossly Negligent" by not adequately "Supervise their Subordinates", were in fact
responsible under Supervisor Liability", See Williams V. Smith, 781 F.2d 319, 323-24,
(2d Cir 1986).

A detailed reference of the Defendants and their Supervisory Position is as followed,

Defendant Burnett is the Superintendent of the Facility, and Oversees all of the
Defendants and is in a position of Authority to Create Policies and or Customs, and is
Responsible for the Actions of his Subordinates.

Defendant Akinyombo is the Deputy Superintendent Of Health Services and is in a position
of Authority to make Policies and or Customs, and is Responsible for the Actions or
inactions of his subordinates.

Defendant Waylon is the Nurse Administration and is in a Position of Authority that at
all times she could have assisted and Intervene in the Actions or Failure to Act, by her
subordinates, which include Nursing staff, and the handling of sick call request that

she was informed by plaintiff who informed her that multiple sick call request was being ignored and the situation with the Reasonable Accommodation being denied, and did nothing to assist Plaintiff, which also included Burnett and Akinyombo.

Defendant Sullivan is Plaintiffs Primary health provider and is only a Nurse Practitioner and was in a position of authority to Assist Plaintiff with the Medical Care and needs including refusing to allow plaintiff to see "A DOCTOR", which to date, Plaintiff has never seen within the Facility to Evaluate or Assist Plaintiff, which also included her personally denying Plaintiffs request for Reasonable accommodations, and to Discontinue and refuse medication Plaintiff was on and or needed, including physical therapy that was denied, and wasn't given till months after Plaintiff was injured further

Defendant Stephen Urbanski was the Deputy Of Security, and was in a Position of authority to create Policy and or Customs, and is responsible for the Actions or the inactions of his subordinates, and knew about the Misconduct and unprofessional Conduct of his Subordinates, including Officer Gibbons, and failed in his duty to train, oversee and remedy a wrong of his officers, and was "CURRENTLY FORCED TO RETIRE OR RESIGN FOR THE INCIDENT THAT OCCURRED IN THE FACILITY ON 12-27-21 to 12-31-21, when C.E.R.T came to the facility unjustly and assaulted multiple inmates including Plaintiff.

Defendant Woods was the Deputy Of Programs and was in a position of Authority to create Customs and or Policies within the Facility and was fully aware of the issues that Plaintiff was being denied Reasonable Accommodations, Entry into a Program and or Service offered by the facility which plaintiff was denied due to disability, and at no time assisted after learning of the wrong being done, and was removed from the Facility, and Defendant Frost is now the Deputy Of Program and after being informed of the situation also did nothing to remedy the wrong done to Plaintiff.

Defendant Gonzalez is the Deputy Superintendent of the Facility, and creates Customs and or Policy within the Facility and was personally informed just as the rest of the defendants about the wrong being done to plaintiff and in no way assisted and failed in

his duty to oversee and train his subordinates.

Defendant ms Reams, is the supervisor of the Inmate Grievance Program and is in a position of authority that created a Custom and/or Policy within the facility which denies inmates an opportunity to "Exhaust Administrative Remedies", and "Redress the Government with Grievances", as well as infringe on Plaintiffs Rights to "Access Of the Court", because under well established laws, prior to the Commencement of Civil Rights Actions in Court the issue "Must Be Fully Exhausted", but due to defendants action and/or failure to act has impeded countless inmates legitimate Claims thrown out for failure to exhaust, See (Shaw V, Ortiz) and (Thompson V. Booth), and her superiors Burnett, Gonzalez Woods, Frost, Akinyombo, Urbanski, All knew about this Breach of duty and allowed for this act to continue "To Date".

The Grievance system is vital to an inmate and is used as a means to assist and fix issues that are so important it could lead to harmful results if not properly addressed such as longer prison sentencing, health issues that could be life threatening, Court proceeding, harassment of officials and assaults, sexual misconduct etc, and if the Grievance system runs in a manner where "Grievances are Chosen to which are responded to" then that system is flawed and immediately needs to be fixed.

Defendant Officer Gibbons is an officer who has had multiple Complaints and grievances against her, and is mentally unstable, and Supervisory Liability is at fault for her actions for failure to train and oversee the actions or inactions of their subordinate, and are fully responsible for her intentional harm of plaintiff.

Plaintiff is in hopes that this explanation of the Defendants positions of authority and the actions or inactions they took is adequate enough for this honorable court review of the claim and opposition papers to find defendants liable to answer for their wrong.

OPPOSITION TO DEFENDANTS "MOTION TO DISMISS" CONCLUSION

Plaintiff, Being a Pro-Se Claimant had provided this Honorable Court, with Enough Detailed Facts within the instant Claim and Opposition Papers, making a the Claim, Plausible On its Face, that Defendants violated Plaintiffs Rights, and had included "Exhibits", "Sworn Affidavits", and "Case Law", making a showing that at all times the Defendants was Aware of the Constitutional Deprivation of Plaintiffs Rights, and to insure that Defendants Actions or Inactions, had violated well established Rights and Law Plaintiff had covered the Prongs needed to be met, such as, "Personal Involvement", "Culpable State Of Mind", "Breach Of Duty", "Deliberate Indifference", "Serious Injury", both "Objective and Subjective Elements", "Dates, times, Places", along with Exhibits Sworn Affidavits, and Case Law Dealing with the Same Defendants and/or Issues within Fishkill Correctional Facility, making a Showing that at "ALL TIMES", Defendants was aware of Plaintiffs Rights Being violated and failed to Act, Prior, During and to Date, to attempt to resolve the issues written within Plaintiffs Claim and Opposition Papers.

Due to Defendants Actions or Failure to Act, Plaintiff was Severely injured in Such a manner,

Plaintiff has Suffered, Severe Back Pain, Neck Pain, Migraines, Head Aches, Trouble Sleeping, Loss Of Sleep, Nightmares, Bad Dreams, Fear Of Retaliation, Feelings of tired, Nervousness, Loss of Weight, Loss of Appetite, Shakiness, Tingling Feeling, Mood Swings, Anxiety, Depression, and Exacerbation of Diagnosed Medical Condition and Disablility.

Alone and Collectively these injuries which plaintiff needed Physical therapy and Mental Health Counseling, Constitute "Serious Injuries", that are "Not De Minimis", and has effected Plaintiffs Current and Future Health and Disability due to Defendants Actions and/or Failure to Act.

WHEREFORE Plaintiff is in hopes and Prayers that this Honorable Court Denies defendants Motion to Dismiss in its Entirety and any other relief this Court deems just and Proper.

Respectfully Submitted By,

9-25-22

(22)

Ralph Rodriguez

# EXHIBIT A

State of New York
Office of the Attorney General
28 Liberty Street
New York, NY 10005

LITIGATION BUREAU
Attn: Andrew Blancato

Ralph Rodriguez
DIN: 17A0128
Fishkill Correctional Facility
P.V. Box 307
Beacon, NY 12508

G-1

RECEIVED
SEP 21 2022
Mailroom

FIRST CLASS



# EXHIBIT
# B

SWORN AFFIDAVIT

I am making this sworn affidavit on the behalf of Ralph Rodriguez, in regards to the Inmate Grievance System here at Fishkill Correctional Facility.

There has been multiple times I had submitted Grievances that was ignored and unanswered, and Complaints about the IGPC goes unanswered by Administration.

In no way does the IGP follow the rules and Directives 4040, 4041. Since my time here at Fishkill Correctional there has only been one IGRC voting and it is suppose to be held every six months, and the members who work at the IGPC are not members voted by the inmate population, and that is because they work for ms, Reams and are not for the inmates.

The same IGPC reps have been there for years and by Directive can only serve for a six month period at a time and then a vote is suppose to be made and never once is any of those members chosen by the inmate population proving that the IGP is corrupt.

This is done purposely to persuade inmates to sign off on grievances and not allow the inmates within Fishkill to Exhaust Administrative Remedies.

Respectfully Submitted by,

A. Cordes

Akeem Cordes 21B0836

Sworn Affidavit

I am writing this sworn affidavit in regards to the I.G.R.C (I.G.P), program here at Fishkill Correctional facility, overseen by Ms Sally Reams.

The program run by her is completely inadequate and nonexisting to the extent that Ms Reams, would Choose the Grievances she wish to files, and completely ignore others in violation to the rules and directive 4040, 4041.

Her actions and failure to act prevents inmates from exhausting their administrative Remedies, and complaints about her to the Administration goes unanswered and ignored as well. This is a sworn testimony of the way the Grievance System is ran here at Fishkill Correctional Facility.

Respectfully Submitted by,

Marcus Gamble 17A2851

# EXHIBIT C



**Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

TO:  RODRIGUEZ, R., # 17A0928  9-1

FROM: S. Reams, IGP Supervisor

SUBJECT:  Late Complaint

DATE:  3/10/22

Please be advised that in accordance with Directive # 4040, section 701.5, a, 1: "an inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an Inmate Grievance Complaint Form (Form # 2131).  If this form is not readily available, a complaint may be submitted on plain paper.  The Complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility."  Note:  Exceptions to this time limit or any appeal time limits may be approved by the IGP supervisor under section 701.6 (g).

In accordance with Directive # 4040, section 701.6, g, 1, ii, "an inmate may pursue a complaint that an exception to the time limit was denied, by filing a separate grievance."

It is also noted that in accordance with Directive # 4040, 701, g, 1, I, a: "The IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances (e.g., timely attempt to resolve a complaint informally by the inmate, etc.).  **An exception to the time limit may not be granted more than 45 days after an alleged occurrence.**"

Your issue concerns an incident dated 12-30-21, which makes this complaint too late to accept for processing.  As I stated to you today in the IGRC office area, any incarcerated individual assigned to the general population may follow up on any complaint that they state they have submitted, by asking the housing unit officer to call the IGRC office and then coming directly to the IGRC office.  At this time, the incarcerated individual may hand deliver a copy of the allegedly submitted complaint or they may sit down and write another one in the IGRC office.  It is advisable to follow up on a complaint, directly with the IGRC office in a timely manner, due to the 21 day time limit from the date of incident to file a complaint.


cc:  file



**Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

TO: RODRIGUEZ, R., # 17A0928  9-1

FROM: S. Reams, IGP Supervisor

SUBJECT: Late Complaint

DATE: 3/10/22

Please be advised that in accordance with Directive # 4040, section 701.5, a, 1: "an inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an Inmate Grievance Complaint Form (Form # 2131). If this form is not readily available, a complaint may be submitted on plain paper. The Complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." Note: Exceptions to this time limit or any appeal time limits may be approved by the IGP supervisor under section 701.6 (g).

In accordance with Directive # 4040, section 701.6, g, 1, ii, "an inmate may pursue a complaint that an exception to the time limit was denied, by filing a separate grievance."

It is also noted that in accordance with Directive # 4040, 701, g, 1, l, a: "The IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances (e.g., timely attempt to resolve a complaint informally by the inmate, etc.). **An exception to the time limit may not be granted more than 45 days after an alleged occurrence.**"

Your issue concerns an incident dated 12-31-21, which makes this complaint too late to accept for processing. As I stated to you today in the IGRC office area, any incarcerated individual assigned to the general population may follow up on any complaint that they state they have submitted, by asking the housing unit officer to call the IGRC office and then coming directly to the IGRC office. At this time, the incarcerated individual may hand deliver a copy of the allegedly submitted complaint or they may sit down and write another one in the IGRC office. It is advisable to follow up on a complaint, directly with the IGRC office in a timely manner, due to the 21 day time limit from the date of incident to file a complaint.

cc: file



## NEW YORK STATE | Commission of Correction

**ALLEN RILEY**
Chairman

**THOMAS J. LOUGHREN**
Commissioner

**YOLANDA CANTY**
Commissioner

September 21, 2022

Mr. Ralph Rodriguez
DIN# 17A0928
Fishkill Correctional Facility
P.O. Box 1245
Beacon, New York 12508

Dear Mr. Rodriguez:

This is in response to your letter received by the Commission on September 14, 2022.

Please be advised that the Commission of Correction has forwarded your complaint letter to the Office of Special Investigations for review and handling.

Please be further advised any future correspondence regarding this matter should be addressed directly to the Office of Special Investigations. You may write to them at the following address:

Chief of Investigations / Office of Special Investigations
NYS Department of Corrections and Community Supervision
State Campus, Building 9
Albany, New York 12226

Sincerely,


Bureau of Field Operations
16707



**Corrections and
Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

April 6, 2022

Ralph Rodriguez, 17-A-0928
Fishkill Correctional Facility
271 Matteawan Road
P.O. Box 1245
Beacon, NY 12508-0307

Dear Mr. Rodriguez:

Acting Deputy Commissioner Moores has asked me to respond to your recent letter.

The Division of Health Services has investigated your concerns with the Health Services staff at Fishkill Correctional Facility. I have been advised that the issue to which you refer is being addressed through the grievance process. Please be advised that Department of Corrections and Community Supervision, Directive # 4040 Incarcerated Individual Grievance Program (IGP), provides incarcerated individuals with an orderly, fair, and simple method of resolving grievances pursuant to Correction Law. The directive makes no provision for an incarcerated individual to refer grievances directly to Central Office.

It is suggested that you continue to bring your medical concerns to the attention of the health care staff using the existing sick call procedure. I am sure they will make every effort to address your needs.

Sincerely,

Susanna Nayshuler
Regional Health Services Administrator
Division of Health Services

# EXHIBIT D

Five Points Correctional Facility
Medical Permit-Health Services
Inmate Name _Rodriquez R_ DIN# _17A0928_
Location _____
_____ cane, crutches-to be returned_____
_____ brace, sling, splint, cast
Description _eggcrate permit_
MISC _____
RN Signature _XC, ordway_ Date _9/17/18_
Expiration Date _9/18/19_

---

# NEW YORK STATE

## Corrections and Community Supervision

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

---

TO:  Inmate

FROM:  Five Points Medical Department

SUBJECT:  New Permit / Annual Renewal Permit

Original Start Date: _____

Current Start Date: _____

Permit Duration: _____

Permit Expiration Date: _____

Five Points Correctional Facility
Medical Permit-Health Services
Inmate Name _Rodriquez, Ralph_
DIN# _17A0928_ Location _____
_____ cane, Crutches-to be returned_____
_____ brace, sling, cast
Description (L) eggcrate mattress
MISC
RN Signature _VSamuel_ Date _9/25/19_
Expiration date _9-12-20_

---

Inmate Name: _____

Din #: _____

Housing Location: _____

The above inmate has been evaluated and there is a medical need for:   ☐ RA    ☑ MED

_____

_____

_____

_____                              _____
Facility Health Services Director/Designee        Date

Reviewed and Approved:

_____                              _____
Deputy Superintendent for Security                Date

I acknowledge receipt of the permitted item described above. I understand I will be responsible for its proper use. Any misuse or damage caused by my negligence may result in revocation of the permitted item, financial reimbursement and disciplinary action.

_____                              _____
Inmate Signature                                  Date

Cc: Block 1ˢᵗ Officer    Medical Records Office    Medical File    RA File (if appropriate)

FP164 (03/17)

Five Points Correctional Facility, 6600 State Route 96, Caller box 400, Romulus, NY 14541 | (607) 869-5111 | www.doccs.ny.gov

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2018)

Case 7:22-cv-02198-PMH   Document 33   Filed 09/29/22   Page 51 of 66

KeyCite Yellow Flag - Negative Treatment
Distinguished by Van Hoven v. City of New York, S.D.N.Y., August 21, 2018

2018 WL 1276826
Only the Westlaw citation is currently available.
United States District Court, S.D. **New York**.

Ralph **RODRIGUEZ**, Plaintiff,
v.
**CITY** OF **NEW YORK** et al., Defendants.

15-CV-07945

|

Signed 03/09/2018

### Attorneys and Law Firms

Eileen Monaghan DeLucia, Matthew Vincent Hamilto Noller, Holwell Shuster & Goldberg, Matthew Charles Weir, Morris Duffy Alonso & Faley, **New York**, NY, for Plaintiff.

**Ralph Rodriguez**, Romulus, NY, pro se.

Agnetha Elizabeth Jacob, Lauren Almquist Lively, **New York City** Law Department, **New York**, NY, for Defendants.

### OPINION AND ORDER

ANDREW L. CARTER, JR., United States District Judge

**\*1** Plaintiff **Ralph Rodriguez** brings this action pursuant to 42 U.S.C. § 1983 against Defendants **City** of **New York** and various employees of the **New York City** Department of Correction ("DOC"), alleging that while in DOC's custody as a pretrial detainee between January 2015 and June 2015 he was subjected to a host of conditions and actions that violated his rights under the United States Constitution. In addition to his unconstitutional conditions of confinement and procedural due process claims, Plaintiff also asserts a violation of his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, for failure to make reasonable accommodations and a state law negligence claim against the **City** of **New York** for an alleged trip-and-fall. Defendants have now moved to dismiss the complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons stated below, Defendants' motion to dismiss is granted in part and denied in part.

### BACKGROUND

The following facts are taken from Plaintiff's Second Amended Complaint ("SAC") and are presumed to be true for the purposes of this motion to dismiss. *See USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia,* 681 F.3d 103, 105 n.4 (2d Cir. 2012).

Prior to his arrest, Plaintiff was stabbed multiple times and experienced serious injuries to his abdomen, right and left arms, and his right wrist. *Id.* ¶¶ 32-33. The stabbing caused extensive nerve, artery, and tendon damage and required surgical removal of muscle and tissue, and as a result, he suffers from ongoing pain, numbness, tingling, weakness, and severely limited mobility in his right arm and hand. *Id.* ¶ 33. Plaintiff also suffers from diagnosed chronic lower back pain caused by an injury to the lumbar region of his spine, chronic pain in his neck and legs, and flat feet. *Id.* ¶ 34. In addition to his physical disabilities, he has been diagnosed with bipolar and antisocial personality disorder, anxiety, claustrophobia, and depression. *Id.* ¶ 35. On January 10, 2015, Plaintiff was arrested and taken into the custody of Defendant **New York City** and DOC at Anna M. Kross Center ("AMKC") on Rikers Island. *Id.* ¶ 18. Defendants were provided notice of Plaintiff's medical conditions and needs through his medical records. *Id.* ¶¶ 37, 61.

Upon arrival at Rikers Island on January 10, 2015, Plaintiff was detained in unsanitary, insect-infested, and overcrowded cells for three days. *Id.* ¶¶ 39-40. Plaintiff was frequently moved from one overcrowded "bullpen" to another, in what was allegedly a deliberate tactic to "destabilize detainees' mental states and cause them confusion, discomfort, disorientation, and anxiety." *Id.* ¶ 46. Detainees in these cells were provided unsanitary food and water, non-working sinks or toilets (resulting in cells soiled with urine and feces), and insufficient number of beds and places to sit. *Id.* ¶¶ 40-41, 44. Due to these conditions, Plaintiff "suffered severe inflammation, itching, and pain in his feet," resulting in one of his toenails being surgically removed. *Id.* ¶¶ 49-50.

**\*2** On January 13, 2015, Plaintiff was placed in a cell for two months. *Id.* ¶ 55. Due to his claustrophobia and the close quarters, Plaintiff filed multiple grievances and made multiple requests to be placed in a dormitory rather than a cell, but was not moved to a dormitory until March 2015. *Id.* ¶¶ 56-57. That same day, Plaintiff was provided a bed with a single mattress. *Id.* ¶ 59. Plaintiff requested that Defendants provide him with

a second mattress or a replacement mattress because the single mattress exacerbated his chronic back, arm, leg, and neck pain. *Id.* ¶¶ 59-60, 62. Plaintiff never received an additional or replacement mattress, which exacerbated his prior injuries and disability. *Id.* ¶¶ 65-66.

On January 30, 2015, Plaintiff started experiencing extreme tooth pain and requested immediate treatment. *Id.* ¶ 68. Despite Plaintiff's repeated requests for dental care, Defendants John Does refused his requests for more than five weeks, granting access to a dentist on March 7, 2015. *Id.* ¶¶ 69, 74. Plaintiff attributes the delay in dental care to the **City** and DOC's *de facto* policy of allowing medical treatment only on certain days. *Id.* ¶¶ 72-73. During the dental appointment, the dentist diagnosed Plaintiff with a tooth infection and informed him that, because of the inordinate delay, his tooth could not be salvaged and would have to be removed. *Id.* ¶¶ 75-76. Three weeks after his diagnosis, Plaintiff underwent oral surgery to remove the tooth on March 28. *Id.* ¶ 78. During this period of time, Plaintiff suffered from tooth pain.

On May 15, 2015, Plaintiff asked Defendant Officer Chambers for disinfectant spray to clean his bed. *Id.* ¶ 81. Officer Chambers provided Plaintiff with a stain remover that Officer Chambers knew presented "risks of severe ... skin irritation upon exposure." *Id.* ¶¶ 82-84. After Plaintiff used the stain remover on his bed, he developed rashes all over his back. *Id.* ¶¶ 85-6. He requested medical treatment, but Officer Chambers and Defendants John Does told Plaintiff to wait for sick call. *Id.* ¶¶ 87-92. Due to the **City's** and DOC's *de facto* policy of providing medical treatment on certain days, Plaintiff received medical treatment for the rashes four days later. *Id.* ¶ 91.

On or about May 28, 2015, Plaintiff was walking near his housing unit when he tripped on a crack in the floor and fell to the ground. *Id.* ¶ 125. The **City** and DOC were aware of the crack but had made no attempt to repair it. *Id.* ¶ 126. Defendant Officer Gant did not warn Plaintiff about the crack or provide any assistance to him after seeing him fall. *Id.* ¶¶ 128-29. Defendant Captain Cain completed a report of the incident, but the report was inaccurate due to omissions of key facts. *Id.* ¶ 132. The fall caused Plaintiff serious injuries to his neck, back, knees, and right ankle, including a torn ligament, and Plaintiff now walks with a limp and uses a medically prescribed cane. *Id.* ¶¶ 133-35.

Lastly, on February 10, 2015, a doctor in Correctional Health Services prescribed Plaintiff an arm brace to prevent "worsening" of the pain, numbness, tingling, and weakness in his right arm and hand resulting from his existing disability. *Id.* ¶ 95. The prescription provided for Plaintiff's use of the brace "during the time of his detention." *Id.* ¶ 103. On June 4, 2015, Defendants Officer Griffin, Captain Plaskett, Officers John Does performed a search of Plaintiff's bed and designated housing area to "look for any weapons or contraband." *Id.* ¶¶ 98-99. Defendant Officer Griffin inspected Plaintiff's medical brace, and Plaintiff showed the documentation of his prescription to Officer Griffin. *Id.* ¶¶ 100-01. Officer Griffin "falsely informed" Plaintiff that the documentation was "no good" and kicked the brace into a pile of trash. *Id.* ¶ 102. Plaintiff again explained he had been prescribed the brace and asked for it back, but Officer Griffin refused. *Id.* ¶ 103. Plaintiff then showed his prescription to Defendant Plaskett, who ignored Plaintiff and told Plaintiff that he could get another brace. *Id.* ¶¶ 109-110. Despite Plaintiff's pleadings, Officer Griffin tore up the documentation. *Id.* ¶¶ 112. During a previous housing search, Plaintiff observed Officer Griffin physically abusing detainees and then objected to his behavior. *Id.* ¶ 115. Officer Griffin admitted that the confiscation of the brace was retaliation for Plaintiff's prior objection. *Id.* ¶ 116. Defendants never returned Plaintiff's brace or provided him a replacement, and Plaintiff's lack of the brace has caused him ongoing pain and discomfort. *Id.* ¶ 118.

### STANDARD OF REVIEW

**\*3** To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a claim must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim has facial plausibility "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Thus, "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). For the purposes of a motion to dismiss, the Court must "accept as true all factual allegations and draw from them all reasonable inferences." *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Rothstein v. UBS AG,* 708 F.3d 82, 94 (2d Cir. 2013)). On a motion to dismiss, a district court considers "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,*

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2018)

Case 7:22-cv-02198-PMH   Document 33   Filed 09/29/22   Page 53 of 66

199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

## DISCUSSION

### A. Unconstitutional Conditions of Confinement

The Due Process Clause of the Fourteenth Amendment governs a pretrial detainee's claim of unconstitutional conditions of confinement, while the Cruel and Unusual Punishments Clause under the Eighth Amendment governs a convicted prisoner's claims of unconstitutional conditions of confinement. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996). A pretrial detainee's Fourteenth Amendment due process rights concerning the conditions of his confinement are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.*

In order to establish a § 1983 claim for alleged unconstitutional conditions of confinement, a pretrial detainee must demonstrate that prison officers "acted with deliberate indifference to the challenged conditions." *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). This involves satisfying two prongs: 1) "objective prong" and 2) "*mens rea* prong." *Id.*

To prove the objective prong, the detainee "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* at 30 (quoting *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013)). When a detainee alleges multiple conditions of confinement, courts may aggregate the effect of all of them "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Walker,* 717 F.3d at 124 (quoting *Wilson v. Seiter,* 501 U.S. 294, 304 (1991)). The conditions "must be measured by its severity and duration, not the resulting injury," but there are no bright line rules regarding severity and duration. *Darnell,* 849 F.3d at 32. The Second Circuit has repeatedly reiterated that the inquiry is fact-intensive. *Id.* at 31.

The *mens rea* prong is defined "objectively." *Id.* at 35. To prove the second prong, the detainee must show that the official "[1] acted intentionally to impose the alleged condition, or [2] recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* Therefore, the detainee does not need

to show that any defendant was subjectively aware of the harmfulness associated with the conditions. *Id.*

<u>Initial Detention</u>

Plaintiff describes a number of conditions about his initial three days in the bullpens, in which he was deprived of sleep, nutritionally adequate food and water, and adequate sanitation. Plaintiff alleges that due to overcrowding he was denied "an adequate place to sleep." SAC ¶ 44. Conditions that prevent sleep can give rise to an unconstitutional conditions claim. *Walker,* 717 F.3d at 126. Defendants contend that Plaintiff does not allege the deprivation of sleep but rather deprivation of an "adequate place" to sleep. However, the Court must draw reasonable inferences in favor of Plaintiff as the motion to dismiss standard requires. *Id.* at 128 (reversing dismissal of plaintiff's complaint alleging unconstitutional conditions of confinement in part for failing to draw all reasonable inferences in favor of plaintiff). Here, it is reasonable to infer that Plaintiff, due to overcrowding and the unsanitary conditions of the holding cells, was prevented from sleeping.

*\*4 Plaintiff also alleges that he was provided unsanitary food and water and not provided with operable sinks and toilets leading to detainees relieving themselves on the floor of the cells. Due Process requires that pretrial detainees are provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the [detainees] who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983) (per curiam) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980)). Due Process also requires that pretrial detainees have "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily waste without unreasonably risking contamination." *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, \*5 (S.D.N.Y. Sept. 17, 1997) (quoting *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir. 1994)). Defendants contend that Plaintiff neither specifically alleges that he was deprived of nutritionally adequate food or water nor alleges that he was unable to use the toilets or dispose of bodily waste. Defendant's contention suffers from the same defect as before: reasonable inferences are drawn for the plaintiff. The descriptor "unsanitary" is sufficient to allege a claim of an objective deprivation. *See Willey v. Kirkpatrick,* 801 F.3d 51, 69 (2d Cir. 2015) (upholding plaintiff's nutritionally inadequate food claim based on allegations that plaintiff's food was "moldy" or "rotten."). Moreover, it was reasonable to infer from sinks and

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2018)

Case 7:22-cv-02189-PMH   Document 32   Filed 09/29/22   Page 54 of 66

toilets being inoperable that Plaintiff could not use them. *See Darnell*, 849 F.3d at 38-39.

However, Plaintiff's pleading fails to meet the *mens rea* prong. He alleges that Defendants intentionally "employed [bullpen therapy] to destabilize detainees' mental states and cause them confusion, discomfort, disorientation, and anxiety." SAC ¶ 46. This allegation, however, is conclusory, and Plaintiff pleads no additional facts to support that assertion. More important, the Complaint does not allege *specific* facts that individual defendants were deliberately indifferent, by alleging, for example, individual defendants' own observations of the "bullpens" or detainees' complaints to officials or officers. *See Cano v. City of N.Y.*, 44 F. Supp. 3d 324, 334 (E.D.N.Y. 2014) (finding that the individual defendants met the *mens rea* prong based on, among other things, their own observations, external reports and complaints, and complaints filed by detainees); *see also Walker*, 717 F.3d at 130 (finding plaintiff's allegations in the complaint that he directly spoke to defendants about conditions and that certain defendants directly witnessed conditions were sufficient to meet the *mens rea* prong). The lack of factual specificity on the issue of Defendants' knowledge is fatal to Plaintiff's claim based on his initial detention. However, if Plaintiff would like to amend the complaint to add the necessary factual specificity, Plaintiff is free to do so.

Denial of Mattress Accommodation

The condition of a detainee's or inmate's mattress "may be so inadequate as to constitute an unconstitutional deprivation." *See Walker*, 717 F.3d at 127; *see also Santiago v. Ponte*, No. 14-CV-6473, 2016 WL 680823, at *2 (S.D.N.Y. Feb 18, 2016) ("[*Walker*] held that the adequacy of a mattress may, alone or in combination with other factors, constitute a condition that satisfies the objective prong of the conditions-of-confinement test if it causes or threatens to cause sufficiently serious harm."). In order to state an unconstitutional conditions of confinement claim based on inadequate bedding, a plaintiff must plead "(1) he had a medical condition requiring a non-standard bed to protect against serious damage to his future health; (2) he made his condition known to the prison officials; (3) he requested a non-standard bed to accommodate the condition; and (4) his request was denied by an official who knew of and disregarded an excessive risk to the plaintiff's health or safety." *See, e.g., Santiago*, 2016 WL 680823, at *2.

Here, Plaintiff alleges that, due to "an injury to the lumbar region of his spine," he suffers from "diagnosed chronic lower-back pain." SAC ¶¶ 33-34, 59-61. His condition was known to the Defendants through his Correctional Health Services medical records. *Id.* ¶¶ 37, 61. He requested "a second mattress or a replacement mattress *because* the single mattress provided to him caused him serious physical pain ... and exacerbated the pain and discomfort caused by his existing disability," *id.* ¶ 62 (emphasis added), but Defendants denied his repeated requests for the second mattress or replacement mattress, despite knowledge of his condition. These allegations are sufficient to state a claim. *See Harris v. Moore*, No. 15 Civ. 1608, 2015 WL 10427865, at *1-4 (S.D.N.Y. Dec. 3, 2015) (denying motion to dismiss where plaintiff was medically authorized to have a second mattress and explained to defendants that his medical condition required the mattress but defendants nonetheless confiscated his second mattress), *report and recommendation adopted*, 2016 WL 908146 (S.D.N.Y. Mar. 2, 2016).

Dental Care

**\*5** Plaintiff also brings a claim based on failure to provide timely dental care. Plaintiff alleges that he "requested immediate dental treatment" for his "extreme tooth pain," but that Defendants John Does refused to grant his request for more than five weeks. SAC ¶¶ 68-69. Even after the dentist diagnosed Plaintiff with a tooth infection and referred him to oral surgery, there was another three week delay in surgery that required the tooth be removed. *Id.* ¶¶ 74-78. These allegations are sufficient to state a claim for failure to provide timely dental care. *See Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("A three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding of an Eighth Amendment violation under section 1983").

Confiscation of Medical Brace

To state a claim for deliberate indifference to serious medical needs, a pretrial detainee must plead both an objective and *mens rea* prong. *Davis v. McCready*, 1:14-cv-6405-GHW, 2017 WL 4803918, at *4 (S.D.N.Y. Oct 23, 2017). For the objective prong, "the alleged deprivation of adequate medical care must be sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal quotation marks omitted). A serious medical need exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d

Cir. 1998) (internal quotation marks omitted). In assessing the seriousness of harm, courts consider (1) "whether a reasonable doctor or patient would find [the alleged deprivation] important and worthy of comment," (2) "whether [it] significantly affects an individual's daily activities," and (3) "whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280.[1] For the *mens rea* prong, the defendant needs to act with a "sufficiently culpable state of mind." *Davis,* 2017 WL 4803918, at *4. This calls for an inquiry into whether an objectively reasonable person in Defendants' position would have known, or should have known, that Defendants' actions or omissions posed an excessive risk of harm to Plaintiff. *Id.* at *8.

Plaintiff alleges that "due to [his] injuries, pain, and nerve damage" from his stabbing he received a prescription from Correctional Health Services for an arm brace to prevent contractures and worsening of his condition. SAC ¶ 95. The prescription of an arm brace by a physician examining his condition indicates the seriousness of the condition, and moreover, the absence of the brace exacerbated Plaintiff's preexisting disabilities and his chronic pain. *Id.* ¶ 106. Accordingly, the objective prong is met. As for Defendants' mental culpability, Plaintiff alleges that he explained his injury to both officers and even showed them his prescription. *Id.* ¶¶ 101-07. Nonetheless, Defendants, both non-medical professionals, disregarded the prescription and withheld his brace. Indeed, Plaintiff alleges that Officer Griffin's motive was retaliation. These allegations show a culpable state of mind. *See, e.g., Harris,* 2015 WL 10427865, at *4 (finding pre-*Darnell mens rea* prong sufficiently pleaded when defendants confiscated plaintiff's medically prescribed mattress despite plaintiff's substantiation of his need of the mattress by showing his medical referral); *Fredricks v. City of N.Y.,* No. 12 Civ. 3734, 2014 WL 3875181, at *6 (S.D.N.Y. July 23, 2014) (finding pre-*Darnell mens rea* prong sufficiently pleaded when defendants confiscated plaintiff's knee brace despite plaintiff's protestation that it would jeopardize his health and wellbeing).

Cleaning Solvent Injuries and Delay in Medical Treatment

  *6  Plaintiff's allegations that Officer Chambers provided him with stain remover and that Defendants delayed medical treatment for the rashes caused by Plaintiff's use of stain remover are insufficient to state an unconstitutional conditions claim. Rashes, in these circumstances, are "generally insufficient to meet the objective requirement of a sufficiently serious condition giving rise to a deliberate indifference claim." *Purdie v. City of N.Y.,* No. 10 Civ. 5802,

2011 WL 1044133, at *3 (S.D.N.Y. Mar. 15, 2011) (listing cases); *see also Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *13 (S.D.N.Y. Oct. 15, 1999) (dismissing deliberate indifference claim related to rashes where rashes were caused by defendants' inability to provide him with gloves and other protective clothing when cleaning pots). Plaintiff, thus, cannot meet the objective prong that the provision of the remover itself was misconduct.[2]

Moreover, Plaintiff's delay in treatment deliberate indifference claim fails. A delay in providing medical care can give rise to a deliberate indifference claim where officials ignore a "life-threatening or fast-degenerating" conditions. *Demata v. New York State Correctional Dep't of Health Services,* 198 F.3d 233, at *2 (2d Cir. 1999) (unpublished) (citing *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir. 1990)); in other words, the condition must be sufficiently serious. Since the rashes are not a sufficiently serious medical condition, the claim is dismissed.

Municipal Liability

Plaintiff alleges that the **City** is liable for the alleged constitutional violations discussed above. To plead municipal liability, a plaintiff must allege the existence of a municipal policy or custom that caused a constitutional violation. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). A plaintiff may meet this "policy or custom" requirement by alleging practices that are "persistent and widespread" as to be "so permanent and well settled as to constitute a custom or usage with the force of law" and to "imply the constructive acquiescence of senior policy making officials." *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870-71 (2d Cir. 1993) (internal quotation marks omitted). Alternatively, a plaintiff can meet this same requirement by alleging that the failure to train or supervise **city** employees amounts "to deliberate indifference to the rights of those with whom the **city** employees interact." *Wray v. City of N.Y.,* 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks omitted). Indeed, the persistent failure of senior personnel who have knowledge of a pattern of constitutionally violative acts to take corrective or remedial actions can give rise to an inference of custom or policy. *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir. 1980); *see also Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (noting that a plaintiff may demonstrate municipal liability by showing that a "policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions"); *Kucharczyk v. Westchester Cty.,* 95 F. Supp. 3d 529, 544 (S.D.N.Y. 2015) (denying motion to

Rodriguez v. City of New York, Not Reported in Fed. Supp. (2018)

Case 7:22-cv-02198-PMH   Document 33   Filed 09/29/22   Page 56 of 66

dismiss *Monell* claim where plaintiff alleged widespread practice about which policymaker must have been aware). At the pleading stage, a "plaintiff must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City,* 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

*7 Plaintiff has alleged (1) a policy of refusing to provide medically necessary mattresses and other reasonable accommodations (SAC ¶ 156); (2) a *de facto* policy "[of] mak[ing] medical treatment available only on certain days" and thus "requir[ing] detainees to wait for medical treatment" for unreasonably long periods of time (*id.* ¶¶ 71-73, 94); and (3) *de facto* policies that permit DOC officers to arbitrarily seize detainees' property (*id.* ¶¶ 121-23). These allegations are sufficient to state a claim as they suggest that events described in the allegations occur with such a degree of regularity that they are the result of policy and custom. In other words, they describe "multiple incidents over a long, continuous time period," which gives rise to an inference of a policy or custom. *See, e.g., Toliver v. City of New York,* No. 10 Civ. 5806, 2012 WL 6849720, at *6 (S.D.N.Y. Sept. 25, 2012) (internal quotation marks omitted); *Ortiz of New York,* 15-CV-5732, 2016 WL 6902477, at *3 ("To plausibly allege a policy or custom, a plaintiff must provide some factual support that is probative of a widespread or repeated occurrence.").

Publicly reported information that the Complaint references corroborates these allegations, including reports that insufficiently supervised corrections officers face no consequences for misconduct and that officers neglected or delayed medical treatment for inmates. *See* SAC ¶¶ 22-23, 29, 121. Contrary to Defendants' contention, Plaintiff may, as courts have allowed, rely on publicly reported information about the experiences of other detainees to corroborate his allegations. Although such reliance on these reports and news articles have little utility on summary judgment, at the motion to dismiss stage, such information suggests that the incidents described in the complaint did not just happen to Plaintiff but also to others. *See Osterhoudt v. City of New York,* No. 10 CV 3173, 2012 WL 4481927, at *1 (E.D.N.Y. Sept. 27, 2012) (upholding *Monell* claims where complaint contained allegations of similar incidents from other lawsuits or settlements). Moreover, this information suggests that Defendant **City of New York** was aware of these unconstitutional conditions but failed to remedy them and thus supports municipal liability. *See, e.g., Santiago v. Westchester Cty.,* No. 13 Civ. 1886, 2014 WL 2048201, at *6 (S.D.N.Y. May 19, 2014) (denying municipality's motion to dismiss where plaintiff relied on DOJ report to show that

municipality was aware of such violations); *Kucharczyk,* 95 F. Supp. 3d at 544-45 (S.D.N.Y. 2015). Accordingly, Plaintiff's *Monell* claim may proceed.

**B. Procedural Due Process**

Plaintiff alleges that the deprivation of his prescribed medical brace without due process violated the Fourteenth Amendment. The Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). Defendants argue that **New York** provides an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action. Relying on *Fredricks v. City of N.Y.,* No. 12 Civ. 3734, 2014 WL 3875181, *7-10 (S.D.N.Y. July 23, 2014), Plaintiff argues that the postdeprivation remedy is inadequate due to the importance of the brace to his well-being and safety and to prevent the further exacerbation of his injuries." The Court disagrees.

In *Fredricks,* the court noted that "a postdeprivation remedy is adequate as long as the plaintiff had access to [1] timely and [2] substantively meaningful review." *Id.* at *8 (quoting *Galdamez v. Taylor,* 329 Fed.Appx. 300, 302 (2d Cir. 2009) (summary order)). Whether a postdeprivation remedy satisfies due process depends on how quickly the remedy is available in light of "the particular deprivation involved." *Fredricks,* 2014 WL 3875181, at *9 (internal quotation marks omitted). The *Fredricks* court held that defendants' deprivation of plaintiff's assistive walking devices (his legal braces, prescription orthotic shoes, and cane) and the alleged hardship to the plaintiff—specifically his "ability to ambulate safely wherever he needed to go"—made litigating the tort law claim inadequate in light of the amount of time any litigation takes. *Id.* Essentially, the hardship imposed by deprivation in *Fredricks* was so onerous, given its interference with plaintiff's ability to walk or move, that the post-deprivation procedures were held to be inadequate. However, the deprivation of Plaintiff's medical arm brace, while unfortunate, did not impose a similar level of hardship as that of the plaintiff in *Fredricks* because it did not burden something as fundamental as the ability to walk. Accordingly, Plaintiff has access to a meaningful and timely postdeprivation remedy here, *see Davis v. New York,* 311 Fed.Appx. 397, 400 (2d Cir. 2009), and his procedural due process claim is dismissed.

## C. ADA

**\*8** Plaintiff alleges that the DOC in violation of Title II of the ADA failed to make reasonable accommodations for his physical and mental disabilities by housing him in "unsanitary" and "overcrowded" bullpens for three days, placing him in a cell instead of a dormitory for two months, and refusing to provide him with an extra or proper mattress. To state a claim under Title II of the ADA, a plaintiff must allege "that (1) he or she is a qualified individual with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities or was otherwise discriminated against by defendants, by reason of plaintiff's disabilities." *Shomo v. City of New York,* 579 F.3d 176, 185 (2d Cir. 2009) (internal quotation marks omitted). Defendants argue that the third element is not met because Plaintiff does not allege that he was denied the opportunity to participate in any services, programs, or activities because of his disabilities. However, Plaintiff has alleged that the failure to provide reasonable accommodations deprived him of the *benefit* of the facility's living quarters, bedding, and medical care without suffering additional pain. *See Allah v. Goord,* 405 F. Supp. 2d 265, 280-81 (S.D.N.Y. 2005). Accordingly, these allegations are sufficient to state an ADA claim.

## D. Negligence

Plaintiff brings a **New York** state law claim for premises liability, specifically that the **City** failed to repair a dangerous crack that it was or should have been aware of and that Plaintiff tripped over the crack.[3] Defendants contend that such allegations fail to state a claim because the allegations lack specific details regarding the incident. However, Plaintiff does not need to plead his case with particularity but provide enough facts to support a plausible inference that the **City** was negligent. *See Burgos v. Satiety, Inc.,* No. 10-CV-2680, 2011 WL 1327684, at \*4 (E.D.N.Y. Apr. 5, 2011). Plaintiff does so here. *See Harris v. IG Greenpoint Corp.,* 72 A.D.3d 608, 609, 900 N.Y.S.2d 44, 45 (1st Dep't 2010).

Alternatively, Defendants request that the Court decline to exercise jurisdiction over Plaintiff's negligence claim because none of Plaintiff's other federal claims are related to the trip and fall. Because Plaintiff's other federal claims are plausibly alleged, exercising supplemental jurisdiction over the negligence claim as they relate to Defendants is proper. In order for a federal court to exercise supplemental jurisdiction, "the federal claim and state claim must stem from the same common nucleus of operative fact; in other words, they must be such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *See Montefiore Medical Center v. Teamsters Local 272,* 642 F.3d 321, 332 (2d Cir. 2011) (internal quotation marks omitted). Defendants thus construe the court's supplemental jurisdiction too narrowly. The inquiry turns not on whether the claims are related but rather if they arise from a "common nucleus of operative fact," specifically whether "the facts underlying the federal and state claims substantially overlapped ... [or] the federal claim necessarily brought the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 335 (2d Cir. 2006) (citation and internal quotation marks omitted). Although the Court dismissed federal claims as to the trip and fall *(see* fn. 2, *supra),* the other federal claims against the **City** (and certain individuals) survive. Indeed, the negligence claim arises from the same set of facts as the federal claims as both involve Plaintiff's time at the Rikers facility. *See Case v. Anderson,* No. 16 Civ. 983, 2017 WL 3701863, at \*7 n.7 & \*20 (S.D.N.Y. Aug. 25, 2017). The Court, thus, in its discretion will exercise supplemental jurisdiction over the negligence claim.

## CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The procedural due process claim is dismissed, and all other claims survive. Plaintiff is granted to leave to amend his claim regarding his initial detention.

## SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1276826

---

Footnotes

1    When the plaintiff is receiving ongoing treatment for a medical condition and alleges that such treatment was interrupted or delayed, then the sufficiently serious inquiry focuses more narrowly on "the particular risk of harm faced by the prisoner" due to the delay or interruption as opposed to just the severity of the underlying medical condition alone. *Smith v.*

*Carpenter,* 316 F.3d 178, 185-86 (2d Cir. 2003). Because Plaintiff was permanently deprived of his arm brace, treatment was denied for a prolonged period of time, and this case is properly considered a refusal to provide treatment rather than a delayed or interrupted treatment case. *Id.* at 186 n.10.

2    Regarding the *mens rea* prong, Plaintiff alleges that Officer Chambers "knew or should have known" that the stain remover causes rashes. However, the *mens rea* prong requires more than mere negligence. *Darnell,* 849 F.3d at 36. ("A detainee must prove that an official acted intentionally or recklessly, and not merely negligently.").

3    Plaintiff's allegations regarding his trip and fall do not state a violation of any constitutional right. Any injury to an inmate or detainee resulting from a negligent act of any official—here, a trip and fall—does not violate the Constitution. *See Muhammad v. Francis,* No. 94-CV-2244, 1996 WL 657922, at *8 (S.D.N.Y. Nov. 13, 1996); *see also Flowers v. City of N.Y.,* 668 F. Supp. 2d 574, 578 (S.D.N.Y. 2009) ("Any claim against the **City** for the slip and fall that resulted in plaintiff's [...] injury—a garden variety tort—is not cognizable under Section 1983[.]").

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT
# E

FP074 (11/07)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONAL SERVICES
**FIVE POINTS CORRECTIONAL FACILITY**
**HEALTH SERVICES MEMO**

**TO:** **PROGRAM COMMITTEE**

**FROM:** **HEALTH SERVICES**

**DATE:** 8-16-18

**RE:** INMATE: Rodriguez, Ralph   DIN: 17A0928   BLOCK: 9B2 4B

**THE ABOVE INMATE HAS BEEN SEEN BY HEALTH SERVICES ON THIS DATE. THE FOLLOWING IS RECOMMENDED:**

_____ MEDICAL BED REST IN CELL. INMATE MAY NOT LEAVE CELL FOR MEALS OR ANY ACTIVITY INCLUDING WORK, PROGRAM OR RECREATION.

✓ CANNOT PUSH / PULL / LIFT OVER __5__ LBS.

_____ NO CLIMBING STAIRS / LADDERS.

_____ NO JUMPING.

✓ NO BENDING / LEANING / SQUATTING / REACHING.

_____ NO WORKING IN WATER.

_____ NO WORKING AROUND MACHINES.

_____ NO WORK IN DUST OR FUME FILLED AREAS.

_____ MEDICAL HOLD. CANNOT PARTICIPATE IN ANY RECREATIONS EXCEPT PLAYING CARDS AND WATCHING TV. INMATE MAY GO TO MEALS.

_____ TEMPORARILY NOT ELIGIBLE TO BE EMPLOYED AS A FOOD HANDLER.

_____ NEEDS TO BE HOUSED CLOSE TO _____.

_____ CANNOT TOLERATE LONG PERIODS OF COLD.

_____ MAY EXERCISE LIMITED AS INDICATED ON THIS FORM.

_____ MAY ATTEND SEDENTARY PROGRAMS, I.E.: ASAT, VOC., ACADEMIC, ART, TRANSITIONAL SERVICES.

_____ MAY GO TO WORK.

✓ OTHER: Limited use of (R) fingers/arm/hand — may write c utensil between 4th + 5th fingers (R). May not be able to stand for prolonged periods.

_____ THESE LIMITATIONS ARE TEMPORARY. INMATE MAY RESUME NORMAL DUTIES AND THE ABOVE RESTRICTIONS WILL END ON: _____ AT _____ A.M. / P.M.

✓ THESE LIMITATIONS ARE PERMANENT.

_____
**Signature - Physician / Nurse**

cc:   Original - Inmate
      Medical Chart
      Block
      Program
      Guidance Unit/Folder

# EXHIBIT
# F

Ralph Rodrigues
Din # 17A0928
Housing Unit 9-1
Fishkill Correctional Facility
P.O Box 307, Beacon New York 12508

9-20-22

## "G R I E V A N C E"

I am writing this Grievance because on 9-13-22, I had filed a Grievance against an
Officer Alexandra Gibbons, for "HARASSMENT", Grievance # 0292-22, Code 49, and on 9-16-22,
I was interviewed by Lieutenant Stephen Carlesimo, and fully explained the situation about
his officer and her illegal actions and harassment towards me, including the Fact that
this Officer Gibbons has had "Multiple Complaints and Grievances" against her and to date
nothing has been done about her unprofessional Conducts and violating the Code of ethics.

Today on 9-20-22 while I was at work at the Law Library, Officer Gibbons had entered my
housing Unit "Screaming and Shouting Where is he? Where is he?" Looking all around the
unit for me, in a hostile manner, and seeing I was not at the unit entered my room.

When I got back to my unit multiple inmates told me of her actions and when I got to my
room I had seen that my personal belonging was thrown around, and she was not my housing
unit officer nor was she authorized to do a search in my room or be in it, and did not
leave any search receipt, and her actions was done in Direct "RETALIATION", for me writing
a Grievance against her in direct violation to D.O.C.C.S Directive 4040 and 4041 IGP.

I had quickly called O.S.I and informed them of the situation and spoke to an O.S.I
officer Oliver who took down the information and made the complaint.

I was informed by this O.S.I officer to write another Grievance and if "ANY MORE
RETALIATION IS DONE TO ME REPORT IT AGAIN, AND THE PROPER MEASURES WILL BE TAKEN", and so
I am now following his instructions as well as informed Lieutenant Carlesimo as well,
because this officer Gibbons has been known to set inmate up, and/or send other officers
after inmates as Retaliation, wherefore if anything else should occur the proper chain of
command has been followed, and something about her unethical conduct can be addressed by
the proper superiors and measures can be taken, to stop these illegal actions.

RESOLUTION SEEKING; To have this officer leave me alone and stop harassing and
retaliating against me because she is mentally unstable.          Respectfully submitted by

Ralph Rodriguez
Din # 17A0928
Housing Unit 9-1
Fishkill Correctional Facility
P.O Box 307, Beacon New York 12508

9-20-22

Dear Lieut. Carlesimo Stephen

    I am writing to you because on 9-16-22 I was interviewed by you in regards to my Grievance against Officer Alexandra Gibbons, Grievance # 0292-22 for Harassment, and when we Spoke, I had fully informed you of the situation and was in hopes that the issue could be resolved without any further situations but that does not seem to be the issue, because to day Officer Gibbons came into the housing unit screaming and shouting "where is he", in a severely aggressive manner, and although I was not at the housing unit, because i was at work at the law library, multiple inmates had told me, and when I got to the unit, and entered my room, my personal belonging were thrown around, and she had entered my room without me being present and did not had any authorization to do so because I did not have any search receipt, and she was not my housing unit officer.

    I had called O.S.I and reported her actions to a Mr Oliver who made a complaint file, and today received a letter from the commissioner stating that he had forward my issues as well to O.S.I for further investigation, because now she is "Retaliating", against me for writing a Grievance against her, and my attempts to resolve this issue, had proved worthless, wherefore, I am being forced to move forward on another grievance against her, because of this issue, of "Retaliation", and am writing to inform you of what had occurred and am in hopes that, the discussion we had, of me just wanting her to leave me alone, does not seem to be working, and her entering my room without me or anyone present is severely burdensome because Officer Gibbons "Can Put Anything In My Room", in an attempt to "Set Me Up", and this issue is getting worse not better. Im sorry to burden you with this issue, but as stated before, "This Is Not My Fault, And She Is Not Stable", and am reporting her actions of retaliation once again, putting you on full notice of her actions

C.C. 1 of 4
Dep of security
Superintendent
D.S.S

Respectfully Submitted,

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

## FISHKILL CORRECTIONAL FACILITY

## GRIEVANCE RECEIPT NOTIFICATION

**TO:**    RuDRiGuez, A 17A0978

(NAME / DIN #)

**FROM:**    Grievance Office

**DATE FILED:**    9/13/2022

This is to inform you that the below referenced grievance has been
received by the Grievance Office and filed on the date noted above.

**GRIEVANCE #** 0292-22

**CODE** 49

**TITLE** C.O. HARASSment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_Ralph Rodriguez_ Din# 17A0928
(In the space above enter the full name(s) of the plaintiff(s)/petitioner(s).)

_22_ Civ. _02198_ (_PMH_) (___)

- against -

**AFFIRMATION OF SERVICE**

_Edward Burnett, et. al_

(In the space above enter the full name(s) of the defendant(s)/respondent(s).)

I, _Ralph Rodriguez_ , declare under penalty of perjury that I have
         (name)

served a copy of the attached _Notice of Motion Request to Resubmit in_
_opposition to Defendants Motion to dismiss_ (document you are serving)

upon _Andrew Blancato_ Assistant District Attorney whose address is _____
         (name of person served)

_28 Liberty Street, New York 10005_
                    (where you served document)

by _Mail Service within Fishkill correctional facility_
   (how you served document: For example - personal delivery, mail, overnight express, etc.)


Dated: _Dutchess_ , _NY_
        (town/city)      (state)

_September_ _25_, 20_22_
  (month)    (day) (year)

_Ralph Rodriguez_
Signature

_Fishkill correctional_
Address

_P.O Box 307_
City, State

_Beacon NY 12508_
Zip Code

_____
Telephone Number

Rev. 05/2010

Ralph Rodriguez
Din # 17A0928
Fishkill Correctional facility
P.O. Box 307
Beacon, NY 12508






United States District Court
Southern District of New York
Attention: PRO-SE Department
U.S Courthouse – 500 Pearl Street
New York, NY 10007

2022 SEP 23 PM 2: 57
SDNY PRO SE OFFICE
RECEIVED

Rodriguez v Burnett et al.          22-CV-02198(PMH)